SECURITIES INDUSTRY ASSOCIATION ET AL. *v.*
BOARD OF GOVERNORS OF THE FEDERAL
RESERVE SYSTEM ET AL.

No. 82–1766.   Argued March 21, 1984—Decided June 28, 1984

138

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 160.

*Harvey L. Pitt* argued the cause for petitioners. With him on the briefs for petitioner A. G. Becker Incorporated were *Henry A. Hubschman, David M. Miles,* and *Laurence H. Tribe. James B. Weidner, John M. Liftin, William J. Fitzpatrick,* and *Donald J. Crawford* filed briefs for petitioner Securities Industry Association.

*Deputy Solicitor General Claiborne* argued the cause for respondents. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Barbara E. Etkind,* and *Anthony J. Steinmeyer.**

JUSTICE BLACKMUN delivered the opinion of the Court.

This case involves a challenge to the efforts of a state commercial bank to enter the business of selling third-party commercial paper. The Board of Governors of the Federal Reserve System (Board) concluded that such activity by state member banks is not prohibited by the Banking Act of 1933, ch. 89, 48 Stat. 162 (commonly known as the Glass-Steagall Act) because commercial paper is neither a "security" nor a "note" within the meaning of that Act and therefore falls outside the Act's proscriptions. The District Court disagreed with the Board, but the Court of Appeals deferred to the Board's interpretation and reversed the judgment of the District Court. Because commercial paper falls within

---

*Briefs of *amici curiae* urging reversal were filed for Goldman, Sachs & Co. by *G. Duane Vieth, Leonard H. Becker,* and *Joseph McLaughlin;* and for the Investment Company Institute by *Louis Loss* and *Thomas D. Maher.*

Briefs of *amici curiae* urging affirmance were filed for Bankers Trust Co. by *John W. Barnum* and *Jennifer A. Sullivan;* and for the New York Clearing House Association et al. by *Robert S. Rifkind, William H. Smith,* and *Michael F. Crotty.*

the plain language of the Act, and because the inclusion of commercial paper within the terms of the Act is fully consistent with the Act's purposes, we conclude that commercial paper is a "security" under the Glass-Steagall Act, and we reverse the judgment of the Court of Appeals.

## I

During 1978 Bankers Trust Company (Bankers Trust), a New York-chartered member bank of the Federal Reserve System, began serving as agent for several of its corporate customers in placing their commercial paper[1] in the commercial-paper market. Petitioners, the Securities Industry Association (SIA), a national securities-industry trade association, and A. G. Becker Inc. (Becker), a dealer in commercial paper, informally expressed concern to the Board about Bankers Trust's commercial-paper activities. SIA and Becker subsequently petitioned the Board for, among other things, a ruling that Bankers Trust's activities are unlawful under §§ 16 and 21 of the Act, 12 U. S. C. §§ 24 Seventh and 378(a)(1). Section 16 prohibits commercial banks from underwriting "securities or stock," while § 21 prohibits them from marketing "stocks, bonds, debentures, notes, or other securities." Petitioners asserted that Bankers Trust's activities violated both § 16 and § 21.

On September 26, 1980, the Board responded to petitioners' request for enforcement of §§ 16 and 21 against Bankers Trust. See Federal Reserve System, Statement Regarding Petitions to Initiate Enforcement Action (1980), App. 122A (Board Statement). The Board acknowledged that Congress enacted the Act to prevent commercial banks from engaging

---

[1] "Commercial paper" refers generally to unsecured, short-term promissory notes issued by commercial entities. Such a note is payable to the bearer on a stated maturity date. Maturities vary considerably, but typically are less than nine months. See generally Hurley, The Commercial Paper Market, 63 Fed. Res. Bull. 525 (1977); Comment, The Commercial Paper Market and the Securities Acts, 39 U. Chi. L. Rev. 362, 363–364 (1972).

in certain investment-banking activities, but explained that Congress did not intend the Act's prohibitions to cover every instrument that could be characterized as a "note" or "security." The Board expressed concern that such a broad interpretation might preclude commercial banks from maintaining many of their traditional activities. Accordingly, the Board took the position that "if a particular kind of financial instrument evidences a transaction that is more functionally similar to a traditional commercial banking operation than to an investment transaction, then fidelity to the purposes of the Act would dictate that the instrument should not be viewed as a security." *Id.*, at 135A. Applying this "functional analysis" to commercial paper, the Board concluded that such paper more closely resembles a commercial bank loan than an investment transaction and that it is not a "security" for purposes of the Glass-Steagall Act. Because of this determination, the Board did not consider whether Bankers Trust's involvement with commercial paper constitutes "underwriting," within the meaning of the Act.

Petitioners challenged the Board's ruling in the United States District Court for the District of Columbia under, *inter alia*, the judicial-review provisions of the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.*, claiming that the ruling was contrary to law. The District Court reversed the ruling, finding that commercial paper falls within the scope of § 21's reference to "notes . . . or other securities." *A. G. Becker Inc.* v. *Board of Governors of Federal Reserve System,* 519 F. Supp. 602, 612 (1981). The court also found error in the Board's "functional analysis" because it focused exclusively on the role that commercial paper plays in the financial affairs of the issuer. This approach ignored the commercial bank's role in the transaction, which the District Court concluded is a central concern of the Act. *Id.*, at 615–616.

The United States Court of Appeals for the District of Columbia Circuit, by a divided vote, reversed the judgment of the District Court. *A. G. Becker Inc.* v. *Board of Governors*

*of Federal Reserve System,* 224 U. S. App. D. C. 21, 693 F. 2d 136 (1982). The Court of Appeals' majority acknowledged that § 21's reference to "notes" was broad enough to include commercial paper, which is a promissory note. The court explained, however, that the term "note" was also susceptible of a narrower reading, limited to long-term debt securities closely resembling a bond or debenture but of shorter maturity. *Id.,* at 28–29, 693 F. 2d, at 143–144. Because the legislative history of the Act indicates that the 1933 Congress sought to encourage commercial banks to invest more heavily in commercial paper than in longer-term, more speculative securities, the court concluded that Congress used the term "notes" in § 21 in this narrower sense. *Id.,* at 29–31, 693 F. 2d, at 144–146. Finally, the court endorsed the Board's functional analysis of commercial paper and concluded that commercial paper more closely resembled a loan than a security because of its low default rate, the large denominations in which it is issued, and the sophistication of its buyers. In the Court of Appeals' view, these features of commercial paper eliminate the concerns that moved Congress to pass the Glass-Steagall Act. *Id.,* at 32–36, 693 F. 2d, at 147–151.

Because of the importance of the issue for the Nation's financial markets, we granted certiorari. 464 U. S. 812 (1983).

## II

The Board is the agency responsible for federal regulation of the national banking system, and its interpretation of a federal banking statute is entitled to substantial deference. As the Court states elsewhere today, "the Board has primary responsibility for implementing the Glass-Steagall Act, and we accord substantial deference to the Board's interpretation of that Act whenever its interpretation provides a reasonable construction of the statutory language and is consistent with legislative intent." No. 83–614, *Securities Industry Assn.* v. *Board of Governors of Federal Reserve System, post,* at 217. We also have made clear, however, that deference is

not to be a device that emasculates the significance of judicial review. Judicial deference to an agency's interpretation of a statute "only sets 'the framework for judicial analysis; it does not displace it.'" *United States* v. *Vogel Fertilizer Co.*, 455 U. S. 16, 24 (1982), quoting *United States* v. *Cartwright*, 411 U. S. 546, 550 (1973). A reviewing court "must reject administrative constructions of [a] statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 32 (1981).

Although these principles establish in general terms the appropriate standard of review, this case presents an additional consideration that counsels against full deference to the Board. At the administrative level, the Board took the position that commercial paper was not a "security" within the meaning of the Act, and that, therefore, it did "not appear necessary to examine the dangers that the Act was intended to eliminate." Board Statement, App. 140A.[2] Before this Court, however, the Board appears to have changed somewhat the nature of its argument. The Board's counsel now insists that the activities of Bankers Trust "involv[e] none of the 'hazards' that this Court identified" as the concerns at which the Act is aimed. Brief for Respondents 40. We previously have stated that *post hoc* rationalizations by counsel for agency action are entitled to little deference: "It is the administrative official and not appellate counsel who possesses

---

[2] Despite this conclusion, the Board responded to concerns that activity similar to that of Bankers Trust might give rise to the problems that the Act sought to avoid, and issued a policy statement with "guidelines" imposing conditions as to when state member banks may sell third-party commercial paper. See 46 Fed. Reg. 29333 (1981). The Board issued these guidelines pursuant to its supervisory authority over state member banks under §§ 9 and 11 of the Federal Reserve Act, 38 Stat. 259 and 261, as amended, 12 U. S. C. §§ 248, 321–338, and § 202 of the Financial Institutions Supervisory Act of 1966, 80 Stat. 1046, as amended, 12 U. S. C. § 1818(b).

the expertise that can enlighten and rationalize the search for the meaning and intent of Congress." *Investment Company Institute* v. *Camp*, 401 U. S. 617, 628 (1971); see also *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962).  As a result, the Board's presentation here of the policies behind the Act as they apply to this case is of less significance than it would be if it had occurred at the administrative level.  Because of this apparent shift, moreover, the contours of the Board's present position are somewhat unclear; much of the Board's argument now addresses the particular characteristics of the commercial paper in this case, apparently leaving open the possibility that commercial paper with different characteristics would qualify as a "security" and be subject to the Glass-Steagall Act's proscriptions.  See Brief for Respondents 33–44.  To the extent that the Board has changed its position from that adopted at the administrative level, its interpretation is entitled to less weight.

## III

## A

In *Camp* this Court explored at some length the congressional concerns that produced the Glass-Steagall Act.  Congress passed the Act in the aftermath of the banking collapse that produced the Great Depression of the 1930's.  The Act responded to the opinion, widely expressed at the time, that much of the financial difficulty experienced by banks could be traced to their involvement in investment-banking activities both directly and through security affiliates.  At the very least, Congress held the view that the extensive involvement by commercial banks had been unwise; some in Congress concluded that it had been illegal.[3]  Senator Glass stated bluntly

---

[3] Several Members of Congress expressed the view that the securities activities of bank affiliates were unlawful because they were not authorized by the federal charters under which national banks operated or by the state charters under which state banks operated.  See 75 Cong. Rec. 9887–9888 (1932) (remarks of Sen. Glass); *id.*, at 9911 (remarks of Sen. Bulkley).

that commercial-bank involvement in securities had made "one of the greatest contributions to the unprecedented disaster which has caused this almost incurable depression." 75 Cong. Rec. 9887 (1932).

Congressional worries about commercial-bank involvement in investment-bank activities reflected two general concerns. The first was the inherent risks of the securities business. Speculation in securities by banks and their affiliates during the speculative fever of the 1920's produced tremendous bank losses when the securities markets went sour.[4] In addition to the palpable effect that such losses had on the assets of affected banks, they also eroded the confidence of depositors in the safety of banks as depository institutions. This crisis of confidence contributed to the runs on the banks that proved so devastating to the solvency of many commercial banks.

But the dangers that Congress sought to eliminate through the Act were considerably more than the obvious risk that a bank could lose money by imprudent investment of its funds in speculative securities. The legislative history of the Act shows that Congress also focused on "the more subtle hazards that arise when a commercial bank goes beyond the business of acting as fiduciary or managing agent and enters the investment banking business." *Camp*, 401 U. S., at 630. The Glass-Steagall Act reflects the 1933 Congress' conclusion that certain investment-banking activities conflicted in fundamental ways with the institutional role of commercial banks.

The Act's legislative history is replete with references to the various conflicts of interest that Congress feared to be present when a single institution is involved in both investment and commercial banking. Congress observed that

---

[4] The failure of the Bank of the United States, for example, was attributed largely to that bank's activities with respect to its numerous securities affiliates. Operation of the National and Federal Reserve Banking Systems: Hearings pursuant to S. Res. 71 before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong., 3d Sess., pts. 1, 7, pp. 116–117, 1017, 1068 (1931) (1931 Hearings).

commercial bankers serve as an important source of financial advice for their clients. They routinely advise clients on a variety of financial matters such as whether and how best to issue equity or debt securities. Congress concluded that it was unrealistic to expect a banker to give impartial advice about such matters if he stands to realize a profit from the underwriting or distribution of securities. See, *e. g.*, 75 Cong. Rec. 9912 (1932) (remarks of Sen. Bulkley). Some legislators noted that this conflict is exacerbated by the considerable fixed cost that a securities dealer must incur to build and maintain a securities-distribution system. Explaining this concern, Senator Bulkley, a major sponsor of the Act, described the pressures that commercial banks had experienced through their involvement in the distribution of securities:

> "In order to be efficient a securities department had to be developed; it had to have salesmen; and it had to have correspondent connections with smaller banks throughout the territory tributary to the great bank. Organizations were developed with enthusiasm and with efficiency. . . . But the sales departments were subject to fixed expenses which could not be reduced without the danger of so disrupting the organization as to put the institution at a disadvantage in competition with rival institutions. These expenses would turn the operation very quickly from a profit to a loss if there were not sufficient originations and underwritings to keep the sales departments busy." *Id.*, at 9911.

Congress also expressed concern that the involvement of a commercial bank in particular securities could compromise the objectivity of the bank's lending operations. Congress feared that the pressure to dispose of an issue of securities successfully might lead a bank to use its credit facilities to shore up a company whose securities the bank sought to distribute. See 1931 Hearings, pt. 7, p. 1064. Some in

Congress feared that a bank might even make unsound loans to companies in whose securities the bank has a stake or to a purchaser of securities that the bank seeks to distribute. *Ibid.* Alternatively, a bank with loans outstanding to a company might encourage the company to issue securities through the bank's distribution system in order to obtain the funds needed to repay bank loans. 75 Cong. Rec. 9912 (1932) (remarks of Sen. Bulkley). Congress also faced some evidence that banks had misused their trust departments to unload excessive holdings of undesirable securities. *Camp*, 401 U. S., at 633; 1931 Hearings, pt. 1, p. 237.

The Act's design reflects the congressional perception that certain investment-banking activities are fundamentally incompatible with commercial banking. After hearing much testimony concerning the appropriate form of a legislative response to the problems,[5] Congress rejected the view of those who preferred legislation that simply would regulate the underwriting activities of commercial banks. Congress chose instead a broad structural approach that would "surround the banking business with sound rules which recognize the imperfection of human nature that our bankers may not be led into temptation, the evil effect of which is sometimes so subtle as not to be easily recognized by the most honorable man." 75 Cong. Rec. 9912 (1932) (remarks of Sen. Bulkley). Through flat prohibitions, the Act sought to "separat[e] as completely as possible commercial from investment banking." *Board of Governors of Federal Reserve System* v.

---

[5] See 1931 Hearings, pt. 1, pp. 19–22 (testimony of J. Pole, Comptroller of the Currency); *id.*, at 191–192 (testimony of A. Wiggin, chairman, Chase National Bank); *id.*, at 238–241 (testimony of B. Trafford, vice chairman, First National Bank of Boston); *id.*, pt. 2, pp. 301–304, 318 (testimony of C. Mitchell, chairman, National City Bank of New York); *id.*, at 356, 364–365 (testimony of O. Young, chairman, General Electric Co.); *id.*, pt. 3, at 539 (testimony of A. Pope, executive vice president, First National Old Colony Corp.).

*Investment Company Institute*, 450 U. S. 46, 70 (1981) *(ICI).*[6]   Such an approach was not without costs in terms of efficiency and competition, but the Act reflects the view that the subtle risks created by mixing the two activities justified a strong prophylaxis.   *Camp*, 401 U. S., at 630.

## B

Sections 16 and 21 of the Act are the principal provisions that demarcate the line separating commercial and investment banking.   Section 16 limits the involvement of a commercial bank in the "business of dealing in stock and securities" and prohibits a national bank from buying securities, other than "investment securities," for its own account.   12 U. S. C. § 24 Seventh.   In addition, the section includes the general provision that a national bank "shall not underwrite any issue of securities or stock."   Section 5(c) of the Act, 12 U. S. C. § 335, makes § 16's limitations applicable to state banks that are members of the Federal Reserve System. It is therefore clear that Bankers Trust may not underwrite commercial paper if commercial paper is a "security" within the meaning of the Act.

Section 21 also separates investment and commercial banks, but does so from the perspective of investment banks.   Congress designed § 21 to prevent persons engaged in specified investment-banking activities from entering the commercial-banking business.   The section prohibits any person "engaged in the business of issuing, underwriting, selling, or distributing . . . stocks, bonds, debentures, notes, or other securities" from receiving deposits.   Bankers Trust receives

---

[6] We recognize, of course, that there are some activities, such as the safekeeping of securities for customers, in which Congress concluded that both commercial and investment banks may safely engage.   The Act merely reflects Congress' view that those investment-banking activities that it determined to be incompatible with prudent commercial banking, such as underwriting securities, created risks that were so subtle as to justify a broad prohibition.

deposits, and it therefore is clear that §21's prohibitions apply to it.

Because §16 and §21 seek to draw the same line, the parties agree that the underwriting prohibitions described in the two sections are coextensive, and we shall assume that to be the case. In any event, because both §16 and §21 apply to Bankers Trust, its activities in this case are unlawful if prohibited by either section. The language of §21 is perhaps the more helpful, however, because that section describes in greater detail the particular activities of investment banking that Congress found inconsistent with the activity of commercial banks.

It is common ground that the terms "stocks," "bonds," and "debentures" do not encompass commercial paper. The dispute in this case focuses instead on petitioners' claims that commercial paper constitutes a "note" within the meaning of §21, and, if not, that it is nevertheless encompassed within the inclusive term "other securities." Thus, petitioners claim that the plain language of the Act makes untenable the Board's conclusion that commercial paper is not a "security" within the meaning of the Act. Petitioners contend further that the role played by Bankers Trust in placing the commercial paper of third parties is precisely what the Glass-Steagall Act sought to prohibit.

## C

Neither the term "notes" nor the term "other securities" is defined by the statute. "This silence compels us to 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Russello* v. *United States*, 464 U. S. 16, 21 (1983), quoting *Richards* v. *United States*, 369 U. S. 1, 9 (1962). Respondents do not dispute that commercial paper consists of unsecured promissory notes and falls within the general meaning of the term "notes." See Board Statement, App. 131A; see also Brief for Respondents 2. Respondents assert, however, that the context in which the term is used suggests that Congress

intended a narrower definition. Because the term appears in a phrase that includes "stocks, bonds, [and] debentures," the Board insists that the Act's prohibitions apply only to "notes [and] other securities" that resemble the enumerated financial instruments. The Board's position seems to be that because "stocks, bonds, [and] debentures" normally are considered "investments," the Act is meant to prohibit the underwriting of only those notes that "shar[e] that characteristic of an investment that is the common feature of each of the other enumerated instruments." Brief for Respondents 23. Applying that criterion to commercial paper, the Board maintains that commercial paper more closely resembles a commercial loan and that it is therefore not an investment of the kind that qualifies as a "security" under the Act.

For a variety of reasons, we find unpersuasive the notion that Congress used the terms "notes . . . or other securities" in the narrow sense that respondents suggest. First, the Court noted in *Camp* that "there is nothing in the phrasing of either § 16 or § 21 that suggests a narrow reading of the word 'securities.' To the contrary, the breadth of the term is implicit in the fact that the antecedent statutory language encompasses not only equity securities but also securities representing debt." 401 U. S., at 635.

There is, moreover, considerable evidence to indicate that the ordinary meaning of the terms "security" and "note" as used by the 1933 Congress encompasses commercial paper. Congress enacted the Glass-Steagall Act as one of several pieces of legislation collectively designed to restore public confidence in financial markets. See the Banking Act of 1933, ch. 89, 48 Stat. 162 (codified as amended in scattered sections of 12 U. S. C.); the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. § 77a *et seq.;* the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. § 78a *et seq.;* and the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U. S. C. § 79a *et seq.* In each of these other statutes, the definition of the term "security" includes commercial paper,

and each statute contains explicit exceptions where Congress meant for the provisions of an Act not to apply to commercial paper.[7] These explicit exceptions demonstrate congressional cognizance of commercial paper and Congress' understanding that, unless modified, the use of the term "security" encompasses it.

The Securities Act of 1933, for example, defines the term "security" to include "any note." 15 U. S. C. § 77b(1). During the hearings on that Act, Senator Glass expressed dissatisfaction with that definition because it plainly did encompass commercial paper. With the support of the Board, he sought to amend the definition of the term to exclude commercial paper,[8] but Congress chose instead to exempt commercial paper from only the registration requirements of the statute, see 15 U. S. C. § 77c(a)(3),[9] while preserving application of the statute's antifraud provisions to all commercial-paper "securities." §§ 77*l*, 77q(c). Congress passed the Glass-Steagall Act two weeks later, and throughout consideration of that Act by the same Committees of the same Congress, the eponymous Senator Glass displayed no

---

[7] See 15 U. S. C. § 77c(a)(3) (exempting certain "note[s]" with maturities of less than nine months from the definition of "security" for certain provisions of the Securities Act of 1933); 15 U. S. C. § 78c(a)(10) (exempting certain "note[s]" with maturities of less than nine months from the definition of "security" under the Securities Exchange Act of 1934); 15 U. S. C. § 79i(c)(3) (exempting "commercial paper and other securities" specified by the Securities and Exchange Commission from the Public Utility Holding Company Act's restriction prohibiting acquisition by a holding company of "securities").

[8] See Securities Act: Hearings on S. 875 before the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 98, 120 (1933); see also Federal Securities Act: Hearings on H. R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., 180–181 (1933).

[9] It is significant that the exemption for commercial paper is described using the term "note," plainly indicating that Congress understood the ordinary meaning of that term to encompass commercial paper.

similar concern over the ordinary meaning of the broad phrase "notes . . . or other securities" in § 21.

The difficulty with the Board's attempt to narrow the ordinary meaning of the statutory language is evidenced by the Board's unsuccessful efforts to articulate a meaningful distinction between notes that the Act purportedly covers and those it does not. In other statutes in which commercial paper is exempted from securities regulation, Congress either has identified a particular feature, such as maturity period, that defines the exempted class of "notes," or it has authorized a federal agency to define it through regulation. See n. 7, *supra*. The Glass-Steagall Act does neither, and the efforts by the Board and the Court of Appeals to provide a workable definition that excludes commercial paper have been fraught with uncertainty and inconsistency. The Court of Appeals concluded that the Act applies only to notes that are issued "to raise money available for an extended period of time as part of the corporation's capital structure." 693 F. 2d, at 143. It is not clear that such a distinction finds support even with reference to the statutory language from which it purportedly derives. There is no requirement, for example, that stocks, bonds, and debentures be used only to meet the capital requirements of a corporation, and, even if there were, the legislative history provides little evidence to suggest that such a distinction was one that Congress found significant.

The Board, in contrast, seems to have concluded that a note is covered by the Act only if the note is properly viewed as an "investment." The Board contends that this approach requires it to consider a "cluster" of the note's features, see Brief for Respondents 34, n. 60, such as its maturity period, its risk features, and its prospective purchasers. Stocks, bonds, and debentures display a wide range of each of these characteristics, however, and the Act's underwriting prohibition does not demonstrate any sensitivity to the characteristics of a particular issue; the Act simply prohibits com-

mercial banks from underwriting them all. Without some clearer directive from Congress that it intended the statutory terms to involve the nebulous inquiry described by the Board, we cannot endorse the Board's departure from the literal meaning of the Act. The Court, in another context, has said pertinently: "Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history. It did not do so, however, and it is not this Court's function 'to sit as a super-legislature,' *Griswold* v. *Connecticut*, 381 U. S. 479, 482 (1965), and create statutory distinctions where none were intended." *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 72, n. 6 (1982).

In this respect, we find ourselves in substantial agreement with petitioners' suggestion that the Board's interpretation effectively converts a portion of the Act's broad prohibition into a system of administrative regulation. By concluding that commercial paper is not covered by the Act, the Board in effect has obtained authority to regulate the marketing of commercial paper under its general supervisory power over member banks. The Board acknowledges that "the sale of third party commercial paper by a commercial bank could involve, at least in some circumstances, practices that are not consistent with principles of safe banking." Board Statement, App. 141A. In response to these concerns, the Board issued guidelines for state member banks explaining the circumstances in which they properly may place the commercial paper of third parties. See n. 2, *supra.*

Although the guidelines may be a sufficient regulatory response to the potential problems, Congress rejected a regulatory approach when it drafted the statute, and it has adhered to that rejection ever since. In 1935, for example, Congress refused to amend the Act to permit "national banks under regulations by the Comptroller of the Currency . . . to underwrite and sell bonds, debentures, and notes." H. R. Conf. Rep. No. 1822, 74th Cong., 1st Sess., 53 (1935). As recently

as 1980, Congress extended to the Comptroller of the Currency authority to issue such rules as were needed to "carry out the responsibilities of the office," but expressly continued to withhold from the Comptroller the authority to issue regulations concerning "securities activities of National Banks under the Act commonly known as the 'Glass-Steagall Act.'" Depository Institutions Deregulation and Monetary Control Act of 1980, §708, 94 Stat. 188, 12 U. S. C. §93a. When Congress has concluded that a particular form of notes should not be covered by the Act's prohibitions, it has amended the statute accordingly. See Banking Act of 1935, §303(a), 49 Stat. 707, 12 U. S. C. §378(a)(1) (exempting mortgage notes from the coverage of §21). In the face of Congress' refusal to give the Board any rulemaking authority over the activities prohibited by the Act, we find it difficult to imagine that Congress intended the Board to engage in the subtle and ad hoc "functional analysis" described by the Board.

D

By focusing entirely on the nature of the financial instrument and ignoring the role of the bank in the transaction, moreover, the Board's "functional analysis" misapprehends Congress' concerns with commercial bank involvement in marketing securities. Both the Board and the Court of Appeals emphasized that Congress designed the Act to prevent future bank losses arising out of investments in speculative, long-term investments. This description of the Act's underlying concerns is perhaps accurate but somewhat incomplete. "[I]n enacting the Glass-Steagall Act, Congress contemplated other hazards in addition to the danger of banks using bank assets in imprudent securities investments." *ICI*, 450 U. S., at 66. The concern about commercial-bank underwriting activities derived from the perception that the role of a bank as a promoter of securities was fundamentally incompatible with its role as a disinterested lender and adviser. This Court explained in *Camp:*

"In sum, Congress acted to keep commercial banks out of the investment banking business largely because it believed that the promotional incentives of investment banking and the investment banker's pecuniary stake in the success of particular investment opportunities was destructive of prudent and disinterested commercial banking and of public confidence in the commercial banking system." 401 U. S., at 634.

At the administrative level, the Board expressly chose not to consider whether these concerns are present when a commercial bank has a pecuniary interest in promoting commercial paper. Board Statement, App. 140A. Although the Board indicates before this Court that such activities do not implicate the concerns of the Act, we are unpersuaded by this belated assertion. In adopting the Act, for example, Congress concluded that a bank's "salesman's interest" in an offering "might impair its ability to function as an impartial source of credit." *Camp*, 401 U. S., at 631. In the commercial-paper market, where the distribution of an issue depends heavily on the creditworthiness of the issuer, a bank presumably can enhance the marketability of an issue by extending backup credit to the issuer. Similarly, as a commercial bank finds itself in direct competition with other commercial-paper dealers, it may feel pressure to purchase unsold notes in order to demonstrate the reliability of its distribution system, even if the paper does not meet the bank's normal credit standards. Recognizing these pressures, this Court stated in *Camp:* "When a bank puts itself in competition with [securities dealers], the bank must make an accommodation to the kind of ground rules that Congress firmly concluded could not be prudently mixed with the business of commercial banking." *Id.*, at 637.

The 1933 Congress also was concerned that banks might use their relationships with depositors to facilitate the distribution of securities in which the bank has an interest, and

that the bank's depositors might lose confidence in the bank if the issuer should default on its obligations. See *id.*, at 631; 1931 Hearings, pt. 7, p. 1064. This concern would appear fully applicable to commercial-paper sales, because banks presumably will use their depositor lists as a prime source of customers for such sales. To the extent that a bank sells commercial paper to large bank depositors, the result of a loss of confidence in the bank would be especially severe.

By giving banks a pecuniary incentive in the marketing of a particular security, commercial-bank dealing in commercial paper also seems to produce precisely the conflict of interest that Congress feared would impair a commercial bank's ability to act as a source of disinterested financial advice. Senator Bulkley, during the debates on the Act, explained:

> "Obviously, the banker who has nothing to sell to his depositors is much better qualified to advise disinterestedly and to regard diligently the safety of depositors than the banker who uses the list of depositors in his savings department to distribute circulars concerning the advantages of this, that, or the other investment on which the bank is to receive an originating profit or an underwriting profit or a distribution profit or a trading profit or any combination of such profits." 75 Cong. Rec. 9912 (1932).

This conflict of interest becomes especially acute if a bank decides to distribute commercial paper on behalf of an issuer who intends to use the proceeds of the offering to retire a debt that the issuer owes the bank.

In addressing these concerns before this Court, the Board focuses primarily on the extremely low rate of default on prime-quality commercial paper. We do not doubt that the risk of default with commercial paper is relatively low—lower perhaps than with many bank loans. For several reasons, however, we find reliance on this characteristic misplaced. First, it is not clear that the Board's exemption of commercial paper from the proscriptions of the Act is limited to commer-

cial paper that is "prime." The statutory language admits of no distinction in this respect, and the logic of the Board's opinion must exempt all commercial paper from the prohibition on underwriting by commercial banks. Second, as described above, it appears that a bank can make a particular issue "prime" simply by extending backup credit to the issuer. Such a practice would seem to fit squarely within Congress' concern that banks would use their credit facilities to aid in the distribution of securities.

More importantly, however, there is little evidence to suggest that Congress intended the Act's prohibitions on underwriting to depend on the safety of particular securities. Stocks, bonds, and debentures exhibit the full range of risk; some are less risky than many of the loans made by a bank. And while the risk features of a security presumably affect whether it qualifies as an "investment security" that a commercial bank may purchase for its own account,[10] the Act's underwriting prohibition displays no appreciation for the features of a particular issue; the Act just prohibits commercial banks from underwriting any of them, with an exception for certain enumerated governmental obligations that Congress specifically has chosen to favor. See 12 U. S. C. § 24 Seventh. The Act's prophylactic prohibition on underwriting reflects Congress' conclusion that the mere existence of a securities operation, " 'no matter how carefully and conservatively run, is inconsistent with the best interests' " of the bank as a whole. 75 Cong. Rec. 9913 (1932) (remarks of Sen. Bulkley, quoting a statement issued by the Bank of Manhattan Trust Co.).

---

[10] It is clear that Congress' concern with commercial-bank purchases of securities was different from its concern about commercial-bank involvement in securities underwriting activities. In 1938 Congress refused to report out of committee legislation that would have allowed national banks to "underwrite or participate in the underwriting of new issues of such securities as [they] may otherwise lawfully purchase for its own account." H. R. 9441, § 1(b), 75th Cong., 3d Sess. (1938).

In this regard, the Board's focus on the fact that commercial banks traditionally have acquired commercial paper for their own accounts is beside the point. It is clearly true, as the Board asserts before this Court, that Congress designed the Glass-Steagall Act to cause banks to invest more of their funds in short-term obligations like commercial paper instead of in longer term and more speculative securities. By so doing, Congress hoped to enhance the liquidity of funds and protect bank solvency. But the authority to discount commercial paper is very different from the authority to underwrite it. The former places banks in their traditional role as a prudent lender. The latter places a commercial bank in the role of an investment banker, which is precisely what Congress sought to prohibit in the Act.[11] See Note,

---

[11] The Board makes an additional argument based on § 16's restrictions on securities purchases by commercial banks. Section 16 prohibits commercial banks from "dealing in securities" on their own account altogether, and permits them to "purchase for [their] own account" only "investment securities." The Board argues that commercial paper does not constitute an "investment security" within the meaning of that term in § 16, and hence that § 16 would not permit commercial banks to purchase commercial paper for their own account if commercial paper were classified as a "security." Because commercial banks traditionally *have* acquired commercial paper for their own account, and because that practice universally has been assumed not to run afoul of the Glass-Steagall Act, the Board argues that the practice cannot be reconciled with § 16 unless commercial paper is not deemed a "security." See Brief for Respondents 17–18, 26–30.

Even if the Board is correct that commercial paper is not an "investment security" under § 16, something that we need not decide, we find the Board's argument unpersuasive because it rests on the faulty premise that the process of acquiring commercial paper necessarily constitutes "the business of dealing" in securities. The underlying source of authority for national banks to conduct business is the first sentence of § 16, which originated as § 8 of the National Bank Act of 1864, ch. 106, 13 Stat. 101. That provision grants national banks the authority to exercise "all such incidental powers as shall be necessary to carry on the business of banking" and enumerates five constituent powers that constitute "the business of banking." One of those powers is "discounting and negotiating promissory notes." 12 U. S. C. § 24 Seventh. The Board appears to concede that the

A Conduct-Oriented Approach to the Glass-Steagall Act, 91 Yale L. J. 102 (1981); Comment, 9 J. Corp. L. 321 (1984).

The Board also seeks comfort in the fact that commercial paper is sold largely to "sophisticated" investors. Once again, however, the Act leaves little room for such an ad hoc analysis. In its prohibition on commercial-bank underwriting, the Act admits of no exception according to the particular investment expertise of the customer. The Act's prohibition on underwriting is a flat prohibition that applies to sales to both the knowledgeable and the naive. Congress expressed concern that commercial-bank involvement in securities operations threatened the ability of commercial banks to act as "financial confidant and mentor" for both "the poor widow" and "the great corporation." 75 Cong. Rec. 9912 (1932) (remarks of Sen. Bulkley). Even if purchaser-sophistication is relevant under the Act, moreover, it is not clear that commercial paper is sold only in large denominations, see Hicks, Commercial Paper: An Exempted Security Under Section 3(a)(3) of the Securities Act of 1933, 24 UCLA L. Rev. 227, 234, and n. 30 (1976), or only to sophisticated investors. See *Sanders* v. *John Nuveen & Co.*, 524 F. 2d 1064 (CA7 1975), vacated and remanded, 425 U. S. 929 (1976).

Finally, it is certainly not without some significance that Bankers Trust's commercial-paper placement activities ap-

---

authority for national banks to acquire commercial paper is grounded in this authorization to discount promissory notes. See Brief for Respondents 18, n. 25. The subsequent prohibition on engaging in "[t]he business of dealing in securities" does not affect this authority; while the Glass-Steagall Act does not define the term "business of dealing" in securities, the term clearly does not include the activity of "discounting" promissory notes because that activity is defined to be a part of the "business of banking." In short, the fact that commercial banks properly are free to acquire commercial paper for their own account implies not that commercial paper is not a "security," but simply that the process of extending credit by "discounting" commercial paper is not part of the "business of dealing" in securities.

pear to be the first of that kind since the passage of the Act. The history of commercial-bank involvement in commercial paper prior to the Act is not well documented; evidently, commercial banks occasionally dealt in commercial paper, but their involvement was overwhelmingly in the role of discounter rather than dealer. See R. Foulke, The Commercial Paper Market 108 (1931); A. Greef, The Commercial Paper House in the United States 63, 403–405 (1938). Since enactment of the Act, however, there is no evidence of commercial-bank participation in the commercial-paper market as a dealer. The Board has not offered any explanation as to why commercial banks in the past have not ventured to test the limits of the Act's prohibitions on underwriting activities. Although such behavior is far from conclusive, it does support the view that when Congress sought to "separat[e] as completely as possible commercial from investment banking," *ICI*, 450 U. S., at 70, the banks regulated by the Act universally recognized that underwriting[12] commercial paper falls on the investment-banking side of the line.

## IV

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

The question in this case is whether the Board of Governors of the Federal Reserve System (Board) adopted an erroneous interpretation of law when it concluded that

---

[12] Because of its conclusion that the commercial paper in this case was not a "security" under the Act, the Court of Appeals did not consider whether the activity of Bankers Trust constitutes "underwriting" within the meaning of § 16, or "the business of issuing, underwriting, selling, or distributing" within the meaning of § 21. We express no opinion on these matters, leaving them to be decided on remand.

commercial paper is not a "security" under, and hence is not subject to the proscriptions of, §§ 16 and 21 of the Glass-Steagall Act, 48 Stat. 184, 189, as amended, 12 U. S. C. §§ 24 Seventh and 378(a)(1). The area of banking law in which this question arises is as specialized and technical as the financial world it governs, and the relevant statutes are far from clear or easy to interpret. The question is accordingly one on which this Court must give substantial deference to the Board's construction. Because of the Board's expertise and experience in this complicated area of law, and because of its extensive responsibility for administering the federal banking laws, the Board's interpretation of the Glass-Steagall Act must be sustained unless it is unreasonable. No. 83–614, *Securities Industry Assn.* v. *Board of Governors of Federal Reserve System, post,* at 217, and n. 16; *Investment Company Institute* v. *Camp,* 401 U. S. 617, 626–627 (1971); see also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 844–845 (1984); *Board of Governors of Federal Reserve System* v. *Investment Company Institute,* 450 U. S. 46, 56–58 (1981); *FEC* v. *Democratic Senatorial Campaign Committee,* 454 U. S. 27, 39 (1981).

Analysis of this case requires simply an examination of the usual sources of statutory interpretation—primarily the statutory language—to determine whether the Board's reading is a reasonable one, even if it is not the only reasonable one. The Court of Appeals departed from this approach when it limited its approval of the Board's position to certain kinds of sales of certain kinds of commercial paper that it thought did not present certain dangers addressed by the Glass-Steagall Act, *A. G. Becker Inc.* v. *Board of Governors of Federal Reserve System,* 224 U. S. App. D. C. 21, 36–37, 693 F. 2d 136, 151–152 (1982), and the Solicitor General, though not actually adopting a similarly limited position on behalf of the Board, has devoted a significant portion of his brief in this Court to elaborating the safety analysis underlying the Court of Appeals' limitation, Brief for Respondents 33–44. It is the Board's position, however, and not that of the Court of

162

Appeals or of the Solicitor General, to which deference is due. It is the Board that has the experience, expertise, and responsibility that require us to give it "considerable deference in its interpretation of the statute." *United States* v. *Mitchell*, 445 U. S. 535, 550 (1980) (WHITE, J., dissenting).[1]

The Board's own careful and thorough opinion, I believe, amply demonstrates the reasonableness—perhaps the inevitability—of its construction of the critical statutory language. Moreover, the Court's construction of the statute and petitioners' objections to the Board's position are unpersuasive. In these circumstances, the Court should defer to the Board and uphold its ruling. Because the Court does not do so, I respectfully dissent.

I

The language of §§ 16 and 21 of the Glass-Steagall Act makes it clear that, in considering whether the Act prohibits a covered bank[2] from selling third-party commercial paper, the threshold issue is whether commercial paper is a "security" within the meaning of those two sections. See *Investment Company Institute* v. *Camp, supra*, at 634–635. If it is not, then commercial paper, which is a debt rather than an equity instrument, is not subject to § 16's regulation of commercial bank transactions in "securities and stock."[3] Nor

---

[1] As petitioner A. G. Becker Inc. says, "[i]t is the Board's position in its ruling, of course, and not the post-hoc rationalization of its counsel, by which the Board's conduct must be judged." Reply Brief for Petitioner A. G. Becker Inc. 3, n. 5. See also *id.*, at 11, n. 23.

[2] All parties acknowledge that banks chartered under state law that are members of the Federal Reserve System, such as Bankers Trust Company, are covered by the Glass-Steagall Act by virtue of 48 Stat. 165, 12 U. S. C. § 335. See n. 12, *infra*.

[3] Section 16 of the Glass-Steagall Act reads, in relevant part:

"The business of dealing in securities and stock by [a national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [national bank] shall not underwrite any

is it subject to § 21's regulation of transactions in "stocks, bonds, debentures, notes, or *other* securities." (Emphasis added.)[4] Section 21's use of the word "other" implies that no debt instrument is within the scope of the section unless it is also a "security."

Despite differences in language, moreover, §§ 16 and 21 are coextensive in their proscriptions of commercial banks' securities activities. The two provisions approach the same problem from different directions: broadly speaking, § 16 tells firms that engage in commercial banking that they cannot engage in certain securities activities; § 21 tells firms that engage in certain securities activities that they cannot engage in commercial banking. See *Board of Governors of Federal Reserve System* v. *Investment Company Institute,*

---

issue of securities or stock: *Provided,* That the [national bank] may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe. . . . As used in this section the term 'investment securities' shall mean marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation in the form of bonds, notes and/or debentures commonly known as investment securities under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency." 12 U. S. C. § 24 Seventh.

[4] Section 21 of the Glass-Steagall Act reads, in relevant part:

"[I]t shall be unlawful . . . [f]or any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor: *Provided,* That the provisions of this paragraph shall not prohibit national banks or State banks or trust companies (whether or not members of the Federal Reserve System) or other financial institutions or private bankers from dealing in, underwriting, purchasing, and selling investment securities, or issuing securities, to the extent permitted to national banking associations by the provisions of [§ 16]." 12 U. S. C. § 378(a)(1).

450 U. S., at 62–63. Moreover, § 21 itself contains a proviso intended "to make it clear that the prohibition in Section 21 [does] not prohibit banks from conducting those securities activities permitted by Section 16." 5 V. DiLorenzo, W. Schlichting, T. Rice, & J. Cooper, Banking Law § 96.02[2], p. 96–15 (1981) (footnote omitted). See H. R. Rep. No. 742, 74th Cong., 1st Sess., 16 (1935) (hereinafter H. R. Rep. No. 742); S. Rep. No. 1007, 74th Cong., 1st Sess., 15 (1935) (hereinafter S. Rep. No. 1007).[5] Indeed, petitioners concede that §§ 16 and 21 proscribe the same securities activities by commercial banks. See Brief for Petitioner A. G. Becker Inc. 24; Brief for Petitioner Securities Industry Association 12. For this reason, the language of both provisions must be examined to determine the intended coverage of the Glass-Steagall Act.

It is apparent from the statutory language that there is no "plain meaning" of the key terms in either § 16 or § 21 that forecloses the Board's interpretation. The Glass-Steagall Act nowhere defines the term "securities," and the term is not so well defined, either generally or as a legal term of art, that commercial paper is plainly included within its meaning. In particular, nothing on the face of the Glass-Steagall Act reveals whether "securities" refers to the class of all written instruments evidencing a financial interest in a business or, alternatively, to a narrower class of capital-raising investment instruments, as opposed to instruments evidencing short-term loans used to fund current expenses. The term "notes" in § 21, on which petitioners rest their argument that the Glass-Steagall Act covers commercial paper, is likewise susceptible to different meanings. Although "note" is often used generically to refer to any written promise to pay a specified sum on demand or at a specified time, see Uniform

_____

[5] Section 21 states that its provisions "shall not prohibit national banks or State banks . . . from dealing in, underwriting, purchasing, and selling investment securities, or issuing securities, to the extent permitted" by § 16. 12 U. S. C. § 378(a)(1).

Commercial Code § 3–104, 2 U. L. A. 17 (1977); Black's Law Dictionary 956 (5th ed. 1979); G. Munn & F. Garcia, Encyclopedia of Banking and Finance 724–725 (8th ed. 1983), it is also used, more narrowly, to refer to a particular kind of capital-raising debt instrument distributed under an indenture agreement, like bonds or debentures but of shorter maturity, see *id.*, at 725 ("The term note also is sometimes applied to short-term bonds . . ."); 1 A. Dewing, The Financial Policy of Corporations 178 (5th ed. 1953).[6]  Commercial paper, which consists of "prime quality, negotiable, usually unsecured short-term promissory notes issued by business organizations to meet part of their short-term credit needs," App. to Pet. for Cert. 65a (footnote omitted), does not come within the narrower interpretations of either "securities" or "notes." Thus, the words "securities" and "notes" in §§ 16 and 21, considered alone, are susceptible to the Board's construction.

Not only do the key terms of §§ 16 and 21, read in isolation, admit the Board's interpretation, but the provisions as a whole lend strong, perhaps decisive, support to the Board's view.   A reading of §§ 16 and 21 reveals that petitioners' interpretation, like any other interpretation that treats commercial paper as a "security," does violence to the statutory language.   And the Board's interpretation makes sense of the statutory language and of its history.

*Section 21.* Petitioners pin almost their entire statutory-language argument on the contention that § 21 uses the term "notes" in its generic sense, as comprising all written promises to pay a specified sum on demand or at a specified time. Aside from the absence of any affirmative evidence favoring that interpretation, there are several reasons to think that petitioners' contention about the broad meaning of "notes" is

---

[6] The 1934 edition of Dewing's classic work, contemporaneous with the 1933 Glass-Steagall Act, contains the same reference to short-term bonds as "notes." A. Dewing, The Financial Policy of Corporations 75 (3d rev. ed. 1934).   See also H. Moulton, The Financial Organization of Society 111–118 (2d ed. 1925); E. Mead, Corporation Finance 301 (rev. ed. 1919).

erroneous. First, § 21's mention of bonds and debentures—both of which are written promises to pay a specified sum on demand or on a specified date, see 1 Dewing, *supra*, at 169, 226—would be redundant if "notes" were as sweeping in its scope as petitioners suggest. Second, and more important, if § 21 included all written promises to pay a specified sum on demand or at a specified time, it would apply to such instruments as certificates of deposit, notes representing a bank loan to a business, bankers' acceptances, and loan participations. See Note, 91 Yale L. J. 102, 118–119, and nn. 126–129 (1981). Yet such a construction of "notes" would render unlawful much banking activity that not even petitioners urge is anything but legitimate commercial banking. For example, petitioners' reading of § 21 would make it "unlawful . . . [f]or any person . . . engaged in the business of issuing, . . . selling, or distributing . . . [certificates of deposit or bankers' acceptances] . . . to engage at the same time to any extent whatever in the business of receiving deposits . . . ." 12 U. S. C. § 378(a)(1).[7] In short, petitioners' reading of § 21 makes nonsense of the statutory language, and it therefore cannot be correct. The Board's reading, the only alternative to petitioners', gains considerable support from this conclusion.

Finally, the language of § 21 provides affirmative support for the reasonableness of the Board's position that "notes" refers only to instruments characterizable as short-term bonds or debentures. In No. 83–614, *Securities Industry Assn. v. Board of Governors of Federal Reserve System, post,*

---

[7] Petitioners conceded at oral argument that certificates of deposit, for example, were notes in the generic sense of that term. See Tr. of Oral Arg. 14. The technical definition of "note" in the Uniform Commercial Code distinguishes certificates of deposit, but it does so only to define a specific class of bank-issued promises to pay money, not because a certificate of deposit is not otherwise a written promise to pay a specified sum on demand or on a specified date. See Uniform Commercial Code § 3–104, 2 U. L. A. 17 (1977).

p. 207, we rely on the "'familiar principle of statutory construction that words grouped in a list should be given related meaning,'" to support our conclusion that the Board reasonably construed the term "public sale" in § 20 of the Glass-Steagall Act, 12 U. S. C. § 377, "to refer to the underwriting activity described by the terms that surround it." *Post*, at 218 (quoting *Third National Bank* v. *Impac, Ltd.*, 432 U. S. 312, 322 (1977)). The same principle is relevant in this case. That stocks, bonds, and debentures are all instruments purchased for investment purposes suggests that "notes" should be read to refer only to instruments similarly purchased for investment purposes. More specifically, the listing of bonds, debentures, and notes as the three "securities" (as opposed to "stock") named in § 21 suggests that the ambiguity in "notes" should be resolved, as the Board has done, by reading the term to refer to instruments similar in character to bonds and debentures. In sum, the Board's position makes good sense of § 21's list of financial instruments by giving the items in the list related meanings.

*Section 16.* The language of § 16, like that of § 21, cannot bear petitioners' construction. Any reading of § 16 that deems. commercial paper a "security" leaves federal banking law laden with contradictions.

Section 16 flatly forbids covered banks to purchase "securities and stock" for their own accounts, but it makes a limited exception for "investment securities." See n. 3, *supra*.[8] It

---

[8] The Court suggests that § 16's reference to the "business of dealing in securities and stock" means that § 16 does not flatly prohibit covered banks from purchasing securities and stock for their own accounts, except as authorized by the proviso, but only from the "business of dealing" in them. *Ante*, at 158–159. Not even petitioners, however, dispute the proposition that § 16 constitutes a flat ban on purchasing, subject to the proviso. Indeed, the legislative history makes clear that Congress so intended § 16. In particular, stock, which is not subject to the proviso, simply may not be purchased by commercial banks for their own accounts. See S. Rep. No. 77, 73d Cong., 1st Sess., 16 (1933); S. Rep. No. 1007,

is undisputed that commercial banks may purchase commercial paper for their own accounts.[9]  Hence, if commercial paper is a "security" within the meaning of § 16, it must be an "investment security."  To put the same point in the reverse order, if commercial paper is not an "investment security," it cannot be a security covered by § 16 at all: otherwise, contrary to what even petitioners acknowledge to be so, banks could not buy it for their own accounts.  The Board concluded that commercial paper is not an "investment security," and therefore is not a "security," under § 16, App. to Pet. for Cert. 69a–74a, and that conclusion is at the very least a reasonable one.  Petitioners nowhere dispute the conclusion that commercial paper is not an investment security; indeed, they effectively concede that it is correct. See Tr. of Oral Arg. 7.

The reasons may be briefly summarized.  Section 16 defines "investment security" to mean "marketable obligations, evidencing indebtedness of any person, copartnership, asso-

---

p. 17; H. R. Rep. No. 742, p. 18; 5 V. DiLorenzo, W. Schlichting, T. Rice, & J. Cooper, Banking Law § 96.02[2], p. 96–16 (1981).

The Court also treats the purchasing and underwriting prohibitions in the Act as if they were entirely separate.  See *ante*, at 158–159.  That treatment is inconsistent with the statutory language.  There is no escaping the fact that any "security" that the Act forbids a commercial bank to underwrite the Act also forbids the bank to purchase, unless it is an investment security.  Although the purposes of the prohibitions are somewhat different, the link between the prohibitions, at least as far as this case is concerned, is indissoluble.

[9] Indeed, the Board observed that commercial banks have long purchased commercial paper for their own accounts.  See App. to Pet. for Cert. 74a, n. 17.  See also A. Greef, The Commercial Paper House in the United States 95–96 (1938); R. Foulke, The Commercial Paper Market 65–74 (1931).  No one in this litigation or anywhere else has ever suggested that commercial banks do not "purchase" commercial paper.  Indeed, not only do the Board and the standard histories of commercial paper refer to banks' "purchasing" of commercial paper, see, *e. g.*, App. to Pet. for Cert. 74a, n. 17; Greef, *supra*, at 292–325, 335–346; Foulke, *supra*, at 65–98, but so too do petitioners, see Brief for Petitioner A. G. Becker Inc. 39; Brief for Petitioner Securities Industry Association 28; Reply Brief for Petitioner Securities Industry Association 3.

ciation, or corporation in the form of bonds, notes and/or debentures commonly known as investment securities under such further definition of the term . . . as may by regulation be prescribed by the Comptroller of the Currency." 12 U. S. C. § 24 Seventh. The Comptroller has never designated commercial paper as an investment security. Moreover, in 1971 the Comptroller's Chief Counsel took the position that commercial paper does not constitute an investment security. See App. to Pet. for Cert. 73a. In addition, the federal banking regulators, including the Comptroller, have always treated a bank's purchase of commercial paper as a loan: it must be treated as such in federally required bank reports, and the Comptroller views the statutory limits on loans to individual borrowers, 12 U. S. C. § 84, as distinct from § 16's limits on holding investment securities of a single issuer, 12 CFR § 7.1180 (1983). See App. to Pet. for Cert. 72a–73a.

History also supports the Board's conclusion that commercial paper is not an investment security. The phrase "investment security" originated in the McFadden Act of 1927, 44 Stat. (part 2) 1224, and the Glass-Steagall Act did not purport to alter the meaning of the phrase. The McFadden Act affirmed the authority of national banks to deal in "investment securities," subject to certain restrictions: it was intended to provide express statutory authorization for national banks' longstanding practice of dealing in corporate bonds. See H. R. Rep. No. 83, 69th Cong., 1st Sess., 3–4 (1926). Congressman McFadden, the sponsor of the Act, expressly stated during floor debate on the bill that commercial paper had not been and would not be regarded as an "investment security" and hence would be subject to the statutory limitations on loans, not to the restrictions of the McFadden Act. 67 Cong. Rec. 3232 (1926). This statement, which was not disputed by anyone in Congress, accurately reflects the fact that banks' involvement with commercial paper had long been understood as distinct from their involvement with investment instruments, since the purchase of commercial

170

paper was regarded as the making of a short-term loan rather than as an investment.[10]  Indeed, as the Board pointed out, "historical studies of the commercial paper market . . . indicate that banks purchased and sold commercial paper (and served as commercial paper dealers) pursuant to their lending functions long before commercial banks began expanding their activities into the underwriting of corporate bonds and other debt obligations after the Civil War, activities that were restricted by the McFadden legislation concerning investment securities and, six years later, by the Glass-Steagall Act."  App. to Pet. for Cert. 72a; see *id.*, at 72a, n. 13 (citing, *inter alia*, Greef, *supra* n. 9, at 6–7, 15–18, 63, 403–405; Foulke, *supra* n. 9, at 108).  In sum, commercial paper has never been treated, and was not intended to be treated, as an investment security under either the McFadden or the Glass-Steagall Act.  Given that banks covered by § 16 have the authority to purchase commercial paper for their own accounts, which they could not do if commercial paper were a security under § 16, it follows that commercial paper cannot be a security within the meaning of the Glass-Steagall Act.

Having established that commercial paper is not an "investment security," it is also possible to draw support for the Board's conclusion from the original 1933 language of § 16. As enacted in 1933, § 16 prohibited national banks from purchasing "investment securities" for their own account and

---

[10] In order for commercial paper to be eligible for discount at Federal Reserve banks, its proceeds may not "be used for permanent or fixed investments of any kind, such as land, buildings, or machinery, or for any other fixed capital purpose" or "for transactions of a purely speculative character" or "for . . . trading in . . . investment securities except direct obligations of the United States."  Consistent with the short maturity of commercial paper, the proceeds must be used "in producing, purchasing, carrying, or marketing goods," "meeting current operating expenses," or "carrying or trading in direct obligations of the United States."  G. Munn & F. Garcia, Encyclopedia of Banking and Finance 196 (8th ed. 1983).

from underwriting any "issue of securities," but the proviso permitted the purchase of "investment securities" subject to the regulation of the Comptroller of the Currency.[11] Thus, the original version of § 16 simply does not apply to any instrument, like commercial paper, that is not an investment security. In 1935 Congress altered this language, but it did so simply "to make it clear that national banks and other member banks may purchase and sell stocks for the account of their customers but not for their own accounts." H. R. Rep. No. 742, p. 18. See also S. Rep. No. 1007, p. 16. Congress had no intent to change the coverage of § 16 with respect to nonequity instruments. In short, the 1933 version of § 16, which was unaltered in any respect relevant to commercial paper, lends strong support to the Board's position that the Glass-Steagall Act does not apply to commercial paper, which is not an "investment security."

Indeed, there is good reason to think that Congress understood the term "securities" to mean nothing broader than "investment securities." First, the 1935 amendment to § 16 substituted "securities and stock" for "investment securities" without suggesting that § 16's application to nonequity instruments was being in any way expanded. Similarly, the

---

[11] Section 16 of the Glass-Steagall Act as enacted in 1933 reads, in relevant part:

"The business of dealing in investment securities by the [bank] shall be limited to purchasing and selling such securities without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [bank] shall not underwrite any issue of securities; *Provided,* That the [bank] may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe . . . . As used in this section the term 'investment securities' shall mean marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation in the form of bonds, notes and/or debentures commonly known as investment securities under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency." 48 Stat. 184.

proviso in § 21, see n. 5, *supra,* enacted into law in 1935 along with the amendment to § 16, refers only to "investment securities" insofar as it addresses banks' "dealing in, underwriting, purchasing, and selling"; yet it is clear, and it is conceded, that the proviso was intended to make § 21's prohibitions coextensive with those of § 16 with respect to all securities activities. See H. R. Rep. No. 742, p. 16 (amendment makes clear that § 21 "does not prohibit any financial institution or private banker from engaging in the securities business to the limited extent permitted to national banks under [§ 16]"); S. Rep. No. 1007, p. 15 (amendment provides that § 21 "should not be construed as prohibiting banks, bankers, or financial institutions from engaging in securities activities within the limits expressly permitted in the case of national banks under [§ 16]"). Moreover, § 5(c) of the Glass-Steagall Act likewise refers only to "investment securities and stock"; [12] yet that provision, as petitioners concede, makes § 16 of the Glass-Steagall Act applicable in full to "state member banks" like the Bankers Trust Company, see Brief for Petitioner A. G. Becker Inc. 2, n. 2; Brief for Petitioner Securities Industry Association 3, n. 3. All of these congressional enactments presuppose that Congress understood "securities" and "investment securities" to refer to the same class of debt instruments, a class that excludes commercial paper.

This conclusion confirms the Board's view that §§ 16 and 21, as amended in 1935, were intended to apply only to investment instruments akin to stocks, bonds, and debentures. It also comports with what the legislative history reveals to have been of concern to the Congress that enacted Glass-Steagall. During the extensive legislative hearings and

---

[12] Section 5(c) of the Glass-Steagall Act provides:

"State member banks shall be subject to the same limitations and conditions with respect to the purchasing, selling, underwriting, and holding of investment securities and stock as are applicable in the case of national banks under [§ 16]." 48 Stat. 165, 12 U. S. C. § 335.

debates leading up to the enactment of the Glass-Steagall Act, Congress focused its attention on commercial banks' participation in the markets for long-term and speculative securities, and commercial paper was distinguished from the investment securities that Congress was worried about. See S. Rep. No. 77, *supra* n. 8, at 4, 8, 9; 75 Cong. Rec. 9904, 9909, 9910, 9912 (1932).[13] Moreover, although commercial banks' purchasing activities were a major subject of congressional concern, and although commercial banks were the dominant buyers of commercial paper at the time, no one in Congress, as far as anything brought to this Court's attention shows, ever adverted to banks' commercial paper activities as contributing to the difficulties at which the Act was aimed. See App. to Pet. for Cert. 75a–76a. Thus, the legislative history shows Congress to have been concerned with commercial banks' involvement with investment instruments, as the Board contends, and not with their involvement with commercial paper.

In sum, the language of §§ 16 and 21 strongly supports the Board's interpretation. Indeed, petitioners have suggested no other construction that can be accommodated by the language of the statute. Since the legislative history makes it impossible to argue that Congress intended something contrary to the statutory language, the Board's conclusion about legislative intent concerning commercial paper appears to be compelled by statute. In any event, it is certainly "a reasonable construction of the statutory language and is consistent with legislative intent." No. 83–614, *Securities Industry Assn.* v. *Board of Governors of Federal Reserve System, post,* at 217.

---

[13] See also Operation of the National and Federal Reserve Banking Systems: Hearings on S. 4115 before the Senate Committee on Banking and Currency, 72d Cong., 1st Sess., pt. 1, pp. 66–67, 146 (1932); Operation of the National and Federal Reserve Banking Systems: Hearings pursuant to S. Res. 71 before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong., 3d Sess., App., pt. 7, pp. 1006–1019 (1931).

## II

Petitioners advance several arguments in an effort to demonstrate the error of the Board's reading of the Glass-Steagall Act, but these arguments are unavailing. It is worth noting at the outset that I have no quarrel with the Court's extensive discussion of the general policies behind the Glass-Steagall Act. *Ante*, at 144–148. None of that discussion, however, speaks to the threshold question whether commercial paper is among the "securities" to which Congress thought those policies would apply when it adopted the Act. For all of the reasons given above, the Board's negative answer to that question is all but mandated by the statutory language and is not contradicted by anything in the legislative history. The Board came to the reasonable conclusion that Congress simply had no intention to apply its policies to commercial paper.

Petitioners argue that Congress understood commercial paper to be a "security" in enacting the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.*, the Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.* (containing an express exclusion of commercial paper from the definition of "security," 48 Stat. 882, as amended, 15 U. S. C. § 78c(a)(10)), and the Public Utility Holding Company Act of 1935, 49 Stat. 803, as amended, 15 U. S. C. § 79a *et seq.* They suggest that this contemporaneous congressional understanding of the scope of the term "securities" requires commercial paper to be treated as a "security" within the meaning of the Glass-Steagall Act. Even accepting its premise, however, the argument does not affect the merits of the Board's position.

In determining the meaning of a term in a particular statute, the meaning of the term in other statutes is at best only one factor to consider, and it may turn out to be utterly irrelevant in particular cases. Congress need not, and frequently does not, use the same term to mean precisely the same thing in two different statutes, even when the statutes

are enacted at about the same time. In this case, the argument from other statutes has little or no weight. Petitioners, who make this argument entirely in the abstract, offer no reason to think that Congress specifically intended "security" to have the same meaning in the Glass-Steagall Act and the securities laws, and the first part of this opinion shows that there are many reasons to think otherwise. In addition, the securities laws' definitions of "security" include some instruments that plainly do not constitute securities under the Glass-Steagall Act. For example, bankers' acceptances are securities under § 2(1) of the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77b(1), yet commercial banks have long bought and sold and dealt in bankers' acceptances as a proper part of their commercial banking, the Board having determined in 1934 that bankers' acceptances were not securities under the Glass-Steagall Act. See App. to Pet. for Cert. 81a.[14]

That the term "securities" should have different meanings in the different statutes makes good sense. The purposes of the banking and securities laws are quite different. The Glass-Steagall Act was designed to protect banks and their depositors. See *Board of Governors of Federal Reserve System* v. *Investment Company Institute*, 450 U. S., at 61; 75 Cong. Rec. 9913–9914 (1932) (remarks of Sen. Bulkley). The securities laws were designed more generally to protect investors and the general public. See *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837, 849 (1975).

In response to the demonstration that the language of §§ 16 and 21 simply cannot accommodate their view without outlawing concededly lawful commercial bank activities, petitioners argue that at least some of the activities at issue are authorized by other statutory language. Most important,

---

[14] The Board observed in its ruling under review in this case that similar problems might arise with respect to certificates of deposit, passbook savings accounts, loan participations, and bills of exchange. App. to Pet. for Cert. 81a–82a.

petitioners observe, national commercial banks have been authorized to purchase commercial paper on their own accounts, under their authority to discount and negotiate promissory notes, since enactment of the National Bank Act in 1864, 13 Stat. 101, currently codified in 12 U. S. C. § 24 Seventh, immediately prior to § 16 of the Glass-Steagall Act. Thus, a national bank has the power "[t]o exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter."

The existence of separate statutory authorizations for banking activity prohibited by petitioners' reading of the Glass-Steagall Act, however, only reinforces the Board's conclusion that "notes" and "securities" cannot have the broad meaning in §§ 16 and 21 that petitioners attribute to it. If any such statutory authorizations and the proscriptions of the Glass-Steagall Act are both to remain in force, only two conclusions are possible. Either the terms "notes" and "securities" must have a meaning narrower than the generic one; or there is a conflict of statutes that cannot be resolved by any interpretation of the statutory language, so that one part of federal banking law must be read as implicitly repealing or overriding another. The latter alternative is a last resort, however, and must be avoided where an interpretation of the statutory language is available that is consistent with legislative intent and that shows the conflict to be merely apparent and not real. As shown above, the Board's reading of §§ 16 and 21 is such an interpretation. It makes sense of the language of federal banking law: for example, it construes "notes" in § 21, in accordance with the terms that surround it in the statute, as referring to investment instruments and hence as not including commercial paper; at the same time, it

construes "promissory notes" in the "discounting and negotiating" language of the National Bank Act, in accordance with the terms that surround it in the statute, as referring to commercial banking instruments and hence as including commercial paper. Petitioners and the Court, by contrast, have not suggested any way out of the flat contradictions that their view of the Glass-Steagall Act creates in federal banking law. It was reasonable for the Board to conclude, App. to Pet. for Cert. 74a–75a, that the language of §§ 16 and 21 itself makes untenable the broad reading of "notes" and "securities" that petitioners suggest and should be read in the narrow fashion set out in the Board's opinion.

Petitioners also contend that the Board's position is shown to be erroneous by the fact that almost 50 years elapsed between the enactment of the Glass-Steagall Act and the Board's ruling. This fact, of course, does not undermine—it does not even address—the otherwise unanswered arguments in support of the Board. In any event, it is of little significance. This is not a case in which a contemporaneous agency construction is later abandoned by the agency. Until it ruled in the Bankers' Trust matter, the Board never took a position on the applicability of the Glass-Steagall Act to commercial paper. That the Board was not asked for almost 50 years to take a position on this question, moreover, simply cannot count for much. There might be any number of reasons—for example, economic reasons (comparative unattractiveness of selling commercial paper) or sociological reasons (conservativism of commercial banks)—to account for commercial banks' not having sought to sell commercial paper until the late 1970's. This Court is in no position to conclude that there simply could be no explanation for this long silence other than the clarity of the Glass-Steagall Act's prohibition, especially when neither statutory language nor legislative history supports such a conclusion.

In response to the Board's contention that the language of § 21 is reasonably construed to apply only to instruments with the characteristics of an investment, petitioners argue that

there is no single set of such characteristics that are common features of stocks, bonds, and debentures, the items listed in § 21 that the Board takes as the starting point for its interpretation. This argument, however, mistakenly places "stocks," on the one hand, and "bonds" and "debentures," on the other, into a single class. Section 16's reference to "securities and stock" establishes that the Glass-Steagall Act distinguishes two classes—"securities," which includes only (though not necessarily all) debt instruments, such as bonds and debentures; and "stock," which includes only equity instruments. The Board's interpretation of "notes" accordingly need assimilate the term only to the class that includes bonds and debentures, not the class that consists of stock, in order to justify reliance on the canon of statutory construction that words placed together should be given a related meaning. See *supra*, at 166–167. The Board's interpretation, which reads "notes" as referring to short-term debt instruments, like bonds and debentures, issued under indenture agreements, does just that.

The Court decries the Board's approach as transforming the Glass-Steagall Act from the prohibitory statute that Congress enacted into a quite different statute delegating regulatory authority over the area to the Board. To be sure, the Board takes the position that the distinguishing characteristic of the instruments covered by the Glass-Steagall Act is whether the instruments represent investment transactions rather than bank-loan transactions. An investment instrument, according to the Board, may be distinguished by reference to a cluster of related characteristics not possessed by commercial paper—for example, the absence of a short maturity, the existence of a substantial secondary market for them, their bearing of "market" risk in addition to "credit" risk, the issuer's freedom to use the proceeds for fixed capital purposes, their common availability to purchasers in small denominations, and their commonly being bought by a large number of purchasers.

There is nothing the least bit unusual about the "cluster" approach to defining a legal term or concept. That is precisely the approach taken by the law every time it gives definition to a term by specifying a set of "factors" to be considered rather than a set of necessary and sufficient conditions to be checked off. The law is replete with instances of this approach, made necessary by the intrinsic complexity and untidiness of our legal concepts and of the world to which they are designed to apply. This approach is hardly out of place in the law's attempt to describe and regulate the financial world, with all its intricacies and its bewildering variety of nominally different but substantively similar (if not identical) financial instruments and transactions.

There is simply no escaping some kind of functional analysis to separate the commercial and investment banking worlds in particular cases, which petitioners acknowledge is at least one chief aim of the Glass-Steagall Act. As noted above, see *supra*, at 165–169, the language of §§ 16 and 21 cannot be read in the sweeping fashion suggested by petitioners: otherwise, those provisions would prohibit concededly permitted commercial bank involvement with a variety of instruments such as commercial paper. Petitioners have suggested no way to make the distinctions needed to give sense to the statutory language that does not involve a functional analysis of what constitutes investment banking and what constitutes commercial banking. For example, petitioners have suggested no way to distinguish the "discounting and negotiating" of "promissory notes," permitted by the National Bank Act, from the "purchasing" of "notes," prohibited by §§ 16 and 21 of the Glass-Steagall Act, a distinction that their position requires them to make. It is hard to imagine how that distinction might be drawn without using a "functional" approach to defining the difference between the commercial and investment banking worlds.

Finally, contrary to petitioners' allegation, the Board's functional analysis does not vest the Board with a substantial

amount of regulatory discretion. In particular, it does not permit the Board to make case-by-case judgments about the Glass-Steagall Act's application to a particular instrument based on the instrument's safety and on whether it presents the dangers addressed by the Act. Indeed, the Board specifically declined to conduct a policy analysis of whether certain commercial paper activities presented the dangers at which the Act was aimed. See App. to Pet. for Cert. 83a. The Board, unlike the Court of Appeals, concluded that the Glass-Steagall Act is inapplicable to all commercial paper, not just to the particular kinds of commercial paper sold by Bankers Trust, *ibid.* The Board's conclusion about the meaning of the Glass-Steagall Act was simply a construction of the statute; it was only under distinct statutory authority to restrain unsafe or unsound banking practices, 38 Stat. 259, 261, as amended, 12 U. S. C. §§ 248 and 321; 64 Stat. 879, as amended, 12 U. S. C. § 1818(b), that the Board issued its guidelines specifying the kinds of commercial paper sales by commercial banks that it would permit.

The Board employed its functional analysis as one small part of its inquiry into the best construction of the statute. The Board did not purport in its ruling to lay down rules for determining what other instruments have the characteristics of an investment instrument so as to constitute a "security" under the Glass-Steagall Act. It simply reasoned that the language and history of the Act demonstrated that the Act does not cover commercial paper. Critical to the Board's conclusion is the fact that federal banking law treats commercial paper in such a way as to give rise to a flat contradiction if the Glass-Steagall Act were interpreted to embrace it. Because of its characteristics, commercial paper has long been treated, by federal law and by bankers, not as an investment instrument but as an instrument that commercial banks may purchase without regard to the proscriptions of the Glass-Steagall Act. Thus, the Board's placing of commercial paper in the commercial rather than investment banking

world is firmly rooted in the statutory language and in a long-standing practice whose lawfulness is not even subject to dispute. Nothing in the Board's ruling extends to any instrument not already widely and lawfully purchased by commercial banks, and petitioners have not identified any class of financial instruments other than commercial paper that would come within the Board's reasoning in this case. The Board's ruling, in other words, is a narrow one with few implications for other applications of the Glass-Steagall Act.

## III

The dangers that Congress sought to eliminate when it enacted the Glass-Steagall Act are easily stated at a level of generality that might make the Board's ruling appear inconsistent with congressional policies. The translation of policy into legislation, however, is always complicated by the necessity of taking into account potentially competing and overlapping laws and policies. The task of this Court, therefore, is to interpret the statutory language that Congress enacted into law. Careful attention to the statutory language is especially important in an area as technical and complex as banking law, where the policies actually enacted into law are likely to be complicated and difficult for a nonspecialist judiciary to discern in their proper perspective.

In this case, the statutory language strongly supports the construction adopted by the Board, and it cannot bear the only construction proposed by petitioners and adopted by the Court. The Board's construction is also wholly consistent with the legislative history. It is singularly inappropriate for this Court, reasoning from the general policies it finds in the statute and with little regard for the statutory language, to reject the construction of the statute adopted by the Board after careful consideration and with full explanation. It is the Board, and not this Court, that has both responsibility for the oversight of much of our Nation's banking system and expertise and experience in applying the arcane body of law

182

that governs it. When the statutory support for the Board's position is as strong as it is in this case, the Court's rejection of the agency's position is unjustified.

I would uphold the Board's ruling that commercial paper does not constitute a "security" within the meaning of the Glass-Steagall Act. Because the Court of Appeals' opinion does not squarely uphold the Board's statutory construction, I would affirm only the judgment of the Court of Appeals, which reverses the District Court's judgment declaring the Board's ruling unlawful.

I respectfully dissent.