Geoffrey C. BEAUMONT, Stephen A. Kramer, and Adele Slutsky, Plaintiffs,

v.

AMERICAN CAN COMPANY, Gerald Tsai, Jr., Norman Alexander, Joseph Auerbach, Gilbert Butler, Max Caplan, Frank T. Crohn, Joseph Fafian, Jr., A. Leon Fergenson, Ronald D. Grimm, E. John Rosenwald, William A. Shea, Brian Yeowell, and Stanley R. Zax, Defendants.

No. 82 Civ. 3533(MEL).

United States District Court, S.D. New York.

Nov. 6, 1985.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (Kenneth H. Holmes, Martha E. Solinger, Junaid H. Chida, of counsel), for defendant American Can Co.

Shea & Gould, New York City (Michael Lesch, Alfred R. Fabricant, of counsel), for the Served Individual Directors-defendants.

Mordecai Rosenfeld, P.C., New York City, and Alton I. Crowell, Newport Beach, Cal., for plaintiff Geoffrey C. Beaumont.

Garwin, Bronzaft & Gerstein, New York City, for plaintiff Stephen A. Kramer; Bruce E. Gerstein, Scott Fisher, on brief.

Kaplan, Kilsheimer & Foley, New York City, and Kohn, Milstein, Cohen & Hausfeld, Washington, D.C., for plaintiff Adele Slutsky.

LASKER, District Judge.

This litigation arises out of the April 8, 1982 merger of Associated Madison Companies, Inc. ("Associated") into AC Financial Services, Inc., a wholly-owned subsidiary of American Can Company ("American Can" or "American"). Before the merger, American Can, a New Jersey corporation, was engaged in a variety of enterprises, including the manufacture of cans and different paper products. Through its "Fingerhut Corporation" unit American Can also was involved in direct-mail marketing. Associated, a New York corporation prior to the merger, was a holding company engaged in the life insurance business. The stocks of both American Can and Associated were listed and traded on the New York Stock Exchange ("NYSE").

On April 8, 1981 Gerald Tsai, Jr., then Chairman of Associated, wrote a letter to William S. Woodside, Jr., then Chairman of American Can. Tsai's letter complimented Woodside on the "bold, but highly intelligent" diversification plans for American Can that were announced in the April 2, 1981 edition of the New York Times. *See* Affidavit of Mordecai Rosenfeld and Ber-

tram Bronzaft, Exhibit 3 (Mar. 7, 1984).[1] Tsai suggested that Associated and American Can's Fingerhut division shared a mutuality of business interests and requested a meeting with Woodside to "enjoy a brief exchange of ideas." *Id.* Subsequent to Woodside's receipt of Tsai's letter, Tsai met several times with members of American Can's management. Shortly after mid-September, 1981, Kenneth Yarnell, Jr., an American Can senior vice president, telephoned Tsai and proposed that American acquire 100% of Associated.

On October 27, 1981 American Can and Associated reached an agreement in principle with respect to a proposed merger. On that date the companies signed a Memorandum of Intent which included, *inter alia,* a provision stating that

> holders of up to 49% of [Associated's] common stock, par value $.40 per share ("Company Common Stock"), will receive per such share $15 in cash, and the balance of such holders will receive per such share the number of shares of [American Can's] common stock, par value $12.50 per share ("Purchaser Common Stock"), determined by dividing $15 by the average closing price per share of Purchaser Common Stock as reported on the New York Stock Exchange Composite Tape during a period to be agreed upon, *provided* that no share of Company Common Stock shall be converted into less

than .4110 or more than .5085 of a share of Purchaser Common Stock.

Rosenfeld Aff., Exh. 4 at 1–2 (emphasis in the original). In addition, the Memorandum of Intent embodied the parties' acknowledgement that

> it may be desirable in facilitating the Merger that [American Can] acquire certain outstanding shares of Company Common Stock or Company Preferred Stock prior to the effective date of the Merger by open market purchase, tender offer or otherwise, and [Associated] agrees to cooperate with and support [American Can] with any such acquisition.

*Id.* at 2–3.

The merger ultimately was effected by a common multistep transaction,[2] which, in this case, involved (1) American's purchase of 34% of Associated's stock from five institutions; (2) a tender offer by American Can for its own common stock; and (3) the merger transaction itself.

Before American engaged in any of the above transactions, Frederick Kanner, a partner at Dewey, Ballantine, Bushby, Palmer and Wood, outside counsel for American Can, wrote to the Securities Exchange Commission ("the SEC" or "the Commission") on behalf of the company. Kanner's November 13, 1981 letter requested an exemption from Rule 10b–6, 17 C.F.R. § 240.10b–6,[3] a rule issued under the Securities Exchange Act of 1934, 15

---

**1.** Hereafter "Rosenfeld Aff., Exh. ____."

**2.** *See, e.g.,* Freund and Greene, *Substance Over Form S–14: A Proposal to Reform SEC Regulation of Negotiated Acquisitions,* 36 BUS.LAW 1483, 1501–04 ("Emergence of Multistep Transaction") (1981) (hereafter *"Substance Over Form"*).

**3.** Rule 10b–6 states in part:
§ 240.10b–6 Prohibitions against trading by persons interested in a distribution.
(a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the act for any person,
(1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or
(2) Who is the issuer or other person on whose behalf such a distribution is being made, or who is an affiliated purchaser, as

that term is defined in paragraph (c)(6) of this section, or
(3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution.

U.S.C. § 78j(b) (1982) ("the Exchange Act"), which prohibits a corporation from making certain stock purchases when the corporation is in the course of a distribution of its own stock. Kanner's letter first summarized the salient points of the proposed Associated/American Can merger and then explained the contemplated private stock purchases:

American [Can] or [its wholly-owned subsidiary] may wish to enter into stock purchase agreements in the very near future with the three institutions referred to above providing for the purchase for cash of some or all of the convertible preferred stock of Associated held by them, as well as for the purchase for cash of the common stock of Associated held by one of such institutions. Alternatively, American [Can] or [its wholly-owned subsidiary] may wish to purchase in the very near future options to acquire for cash some or all of such convertible preferred stock or common stock. Assuming full conversion by the three institutions of the convertible preferred stock of Associated held by them, and no other issuance of Associated's common stock, the Associated stock held by them would constitute approximately 37% of Associated's common stock which would be outstanding.

Rosenfeld Aff., Exh. 6.

As set forth in Kanner's letter, the reason for the requested 10b–6 exemption was as follows:

American [Can] understands it is the position of the Staff that as a consequence of having entered into the agreement in principle, American may be deemed to be engaged in a distribution of its common stock, subject to Rule 10b–6, and that the Associated common stock may be deemed to be a "right to purchase" the American common stock to be distributed in the Merger. Accordingly, it could be argued that, absent an exemption, the proposed pre-merger purchases described above by American [Can] or [its wholly-

owned subsidiary] of Associated's stock would be prohibited by Rule 10b–6.

*Id.* at 4.

On November 20, 1981 Kanner again wrote to the SEC, this time explaining that subsequent to November 13 American Can had made two additional decisions with respect to the proposed merger. The letter related to the SEC that American had decided:

(i) subject to market conditions, to commence a tender offer (the "Offer") as soon as practicable for its own common stock in an amount estimated to be sufficient to provide for the shares that would be deliverable to stockholders of Associated who become entitled to receive shares of American's common stock in the Merger and (ii) to permit stockholders of Associated to elect, during the period in which proxies are solicited for the Associated special stockholders' meeting to vote on the Merger, to receive in the Merger $15 in cash per share of Associated's common stock (or $37.50 in cash per share of Associated's preferred stock) in lieu of American's common stock (a "Cash Election"). The Cash Elections will be available for a maximum of 49% of Associated's shares of common stock and preferred stock, respectively, reduced by the number of shares thereof purchased in advance of the Merger by American ... and the number of such shares as to which dissenters' rights are duly exercised prior to the vote of Associated stockholders on the Merger.

Rosenfeld Aff., Exh. 7 at 3–4.

Based upon these considerations American Can sought an additional Rule 10b–6 exemption from the SEC since, arguably, "absent an exemption purchases of American's common stock pursuant to the Offer and purchases of Associated's stock pursuant to the Cash Elections would be prohibited until the distribution of American's common stock pursuant to the Merger has been completed or the Merger has been abandoned." *Id.* at 5. In addition, American Can requested the Commission to take a

"no-action" position under Rule 10b–13,[4] 17 C.F.R. § 240.10b–13 (which prohibits stock purchases other than pursuant to the terms of the tender offer during the pendency of such tender offer), because it was their belief "that the grant of the Cash Elections should not be considered a discrete transaction constituting a tender offer, separate from the Merger, and, accordingly, should not be deemed to be within the contemplation of Rule 10b–13." *Id.* at 6.

On December 1, 1981 the SEC responded to both of Kanner's letters and granted American Can's requests. *See* Rosenfeld Aff., Exh. 8. Further, by letter of December 24, 1981 the Commission took a "no-action" position under Rule 10b–13 with respect to the purchase of Associated stock from the institutional shareholders, although American Can apparently did not solicit a "no-action" letter with respect to those particular stock purchases. Rosenfeld Aff., Exh. 9. The December 24th letter states:

> On the basis of your representations and the facts presented, the Commission has granted an exemption from Rule 10b–6 to permit the Company to make Pre-Merger Purchases of Associated's common stock and convertible preferred stock. In addition, on the basis of those facts and representations, in particular that (i) the institutions will not receive a price higher than the other shareholders of Associated will receive in the Merger and (ii) that full disclosure of the Purchase Agreements will be made to shareholders of Associated prior to their vote on the Merger, this Division will not recommend that the Commission take en-

forcement action under Rule 10b–13 with respect to the Pre-Merger Purchases. *Id.* at 2.

Both of the December SEC letters contained a summary of Kanner's description of the proposed merger. Both also stated that the positions of the Commission were based solely on the facts and representations presented. American was instructed that in the event of any material change in the facts presented to the SEC, American Can should discontinue the proposed transactions with which the exemptions and "no-action" positions were concerned "pending presentation of the facts for [SEC] consideration." *See, e.g., id.* at 3.

In January of the following year American Can issued a number of press releases concerning three steps that were taken by American Can in relation to the proposed merger. On January 7, 1982 the Company announced that it had

> entered into agreements with five institutional investors to purchase a total of 1,754,320 shares of common stock and 490,000 shares of convertible preferred stock of Associated Madison Companies, Inc.

Holmes Affidavit, Exhibit D (Apr. 20, 1984).[5] The release further stated that once the purchases were completed, and assuming conversion of all of Associated's preferred stock into common stock, American Can would own approximately 34% of Associated's outstanding common stock. According to the press release, the terms of the agreements were that

---

**4.** Rule 10b–13 states in part:

§ 240.10b–13 *Prohibiting other purchases during tender offer or exchange offer.*

(a) No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be ac-

quired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected: *Provided, however,* That if such person is the owner of another security which is immediately convertible into or exchangeable for the security which is the subject of the offer, his subsequent exercise of his right of conversion or exchange with respect to such other security shall not be prohibited by this section.

**5.** Hereafter "Holmes Aff., Exh. _____."

American would pay $13 per share of common stock, or $32.50 per share of convertible preferred stock, at the time of completing the stock purchases. The purchase price would total $38,731,160. In addition, if the merger with Associated were completed as contemplated, American would pay the institutions a supplemental purchase price equal to the amount by which the merger price exceeds $13 per share of common stock (or underlying common stock in the case of the convertible preferred stock).

*Id.*

Two additional press releases were issued on January 12, 1982. One of them,[6] issued jointly by Associated and American Can, stated that the companies had modified the terms by which Associated would become a wholly-owned subsidiary of American.

Under the revised proposal, holders of up to 49% of Associated's common stock would receive $15 per share in cash and the remaining holders of Associated's common stock would receive for each such share .4545 of a share of American's common stock. Associated's convertible preferred stock would be exchanged on a basis proportionate to the value of the underlying common stock.

Holmes Aff., Exh. E. The news disclosure also contained a short recapitulation of the January 7, 1982 announcement pertaining to the purchase agreements with the institutional shareholders. This release however, contained a statement that "[t]he maximum number of Associated's shares that could be exchanged for cash in the merger would be reduced to the extent of such purchases." *Id.*

The stage was set for final consummation of the merger on February 23, 1982 when the parties signed an "Agreement and Plan of Merger." Rosenfeld Aff., Exh. 1 at Annex I. Two days later a Proxy Statement-Prospectus was sent to all Associated shareholders soliciting their votes on the transaction. Rosenfeld Aff., Exh. 1. At a special shareholders' meeting held on March 26, 1982, 83.13% of the outstanding Associated shares (99.4% of the votes cast) were voted in favor of the merger. When the merger was consummated on April 8, 1982, approximately 8%[7] of the Associated shareholders received cash at the rate of $15 per share of Associated common stock. The remaining Associated shareholders received American stock valued at $12.61.[8]

This class action[9] was commenced on May 28, 1982, on behalf of the former Associated shareholders who received American Can stock instead of cash in the merger. Under a variety of legal theories, plaintiffs seek to recover the difference between the value of American Can stock at the time of the exchange and the $15 per share that the Associated shareholders whose cash preferences were honored received.

The Second Consolidated Amended Complaint ("the Amended Complaint") alleges five causes of action, namely, (1) that the defendants breached the provisions of the

---

**6.** The other press release announced American Can's intention to make a cash tender offer (for up to two million shares of its outstanding common stock) by means of an Offer to Purchase which was expected to be filed with the SEC on the following day. American's tender offer for its own shares is not a subject of this litigation.

**7.** The defendants allege that 9% of the Associated shareholders received cash in the merger. However, this disputed fact is not of critical significance to a determination on the cross-motions for summary judgment.

**8.** Defendants concede that the value of American Can common stock on March 26, 1982, the date of the vote on the merger, was $12.62. They assert, however, that on April 9, 1982, the date the merger was finally consummated, the stock was valued at $12.95. It is unclear whether plaintiffs received $12.61 or $12.95 per Associated common share in the merger. This, however, is a question pertaining to damages and is irrelevant on the issues of liability raised by the cross-motions. While we will refer in this Memorandum to the price quoted by the plaintiffs, this does not constitute a finding of fact.

**9.** On June 28, 1983 we granted plaintiffs' motion to maintain this action as a class action and instructed plaintiffs to submit an appropriate order on notice. To date no such order has been submitted.

Memorandum of Intent, a purported contract pursuant to which plaintiffs claim they have rights as third party beneficiaries; (2) that the proxy statement omitted material facts and was false and misleading in violation of Exchange Act Section 14(a), 15 U.S.C. § 78n(a) (1982); (3) that the material omissions also constituted a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (4) that the defendants failed to follow the tender offer procedures contained in Williams Act Sections 14(d)–(e), 15 U.S.C. §§ 78n(d)–(e); and (5) that the merger between Associated and American Can violated Section 501(c) of New York's Business Corporation Law, N.Y.BUS.CORP.LAW § 501(c) (McKinney 1963).

The plaintiffs move pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to certain claims.[10] Defendants jointly cross-move for summary judgment as to the entire Amended Complaint. For the reasons set forth below plaintiffs' motion for summary judgment as to their federal claims is denied. Defendants' motion for summary judgment as to plaintiffs' third party beneficiary claims is granted and paragraph 20 of the Amended Complaint is dismissed. Decision as to plaintiffs' state law claim is reserved. Defendants' cross-motion for summary judgment on plaintiffs' claims under Sections 10(b) and 14(a) is granted as to all of the alleged omissions except for the one contained in paragraph 16(a)(3)(d) of the Amended Complaint. As to that paragraph, defendants' cross-motion will be granted unless plaintiffs submit appropriate affidavits within two weeks. Defendants' cross-motion for summary judgment on Section 14(d)(7) is granted as to the cash election merger. As to the institutional stock purchases defendants' motion will be granted unless within two weeks from the filing of this Memorandum plaintiffs submit affidavits pursuant to Rule 56(f), Fed.R.Civ.P., in accordance with this decision.

## I. *Third Party Beneficiary Claims*

Plaintiffs assert in the Amended Complaint that Associated's shareholders are the intended beneficiaries of the October 27, 1981 Memorandum of Intent between Associated and American Can, and that their status as beneficiaries entitles them to enforce what they characterize as the "contractual right to receive American Can stock valued (as of March 26, 1982) at $15 for each share of Associated common stock." Amended Complaint at ¶ 20(c). However, plaintiffs appear to have abandoned this position in favor of a different proposition which they argue in their briefs, namely, that the Associated shareholders were the intended beneficiaries of the SEC's December 1st and December 24th letters granting American Can's requests for Rule 10b–6 exemptions and a "no-action" position as to Rule 10b–13. *See* Plaintiffs' Memorandum at 17–21; Plaintiffs' Reply Memorandum at 11–20. Under this new theory, they assert that as "the proper parties to be benefitted by the SEC letters" they are entitled to enforce American Can's "commitment" not to pay the institutional shareholders a price higher than the other shareholders would receive in the merger, and to reap the benefit of American Can's "binding obligation" to pay all Associated shareholders stock equal to $15 per share.

The defendants answer that "[s]ince the plaintiffs have proffered no basis for concluding that such correspondence was ever intended to create a contract, much less one for the benefit of a group of Associated shareholders, the argument calls for no further response." Defendants' Memorandum at 3 n *. They then devote a substantial portion of their brief to rebuttal of what they view as the plaintiffs' primary legal theory, which, as the defendants interpret it, is a claim that the defendants violated Rule 10b–6. Finally, the defendants assert that they are entitled to summary judgment on the third party benefi-

---

**10.** The motion requests summary judgment on the issue "of liability", but plaintiffs' initial brief asserts arguments only as to some claims.

ciary claim asserted in the Amended Complaint because (1) the Memorandum of Intent is not a contract and (2) even if it was to be regarded as such it confers no rights upon the plaintiffs.

## A.

■ The plaintiffs' position cannot be sustained on either third party beneficiary theory. In the first place, the most recent incarnation of this theory is not contained in the Amended Complaint and plaintiffs are bound by their pleadings in the first instance. However, since the determination as to the adequacy of plaintiffs' claims under Section 10b of the Exchange Act, 15 U.S.C. § 78j(b), and Section 14(a) of the Williams Act, 15 U.S.C. § 78n(a), requires resolution of this issue, and recognizing that under Rule 15, Fed.R.Civ.P., the Amended Complaint might be further amended, it is appropriate to consider plaintiffs' claims pertaining to the SEC's letters.

In this regard, plaintiffs' argument is confusing at best. The sole legal justification offered in support of their argument that they are the beneficiaries of the SEC's letters is that "[t]he law is clear that persons for whose benefit a rule was established may sue to enforce the terms of that rule." Plaintiffs' Memorandum at 19. (citations omitted). However, as we interpret the Amended Complaint and plaintiffs' briefs, neither purports to assert a claim under Rule 10b–6, the rule pursuant to which the SEC exemptions were granted. In their reply brief plaintiffs agree with our interpretation and continue to press the claim that they are the beneficiaries of the SEC's correspondence. *See* Plaintiffs' Reply Memorandum at 2.

■ Third party beneficiary rights arise, if at all, from a contract, *cf. Frank Mastoloni & Sons v. United States Postal Service,* 546 F.Supp. 415, 420 (S.D.N.Y.1982)

(no third party beneficiary rights in an unenforceable contract), and the contracting parties must have intended to confer a direct benefit on the third parties. *See, e.g., Chaplin v. Consolidated Edison Co.,* 579 F.Supp. 1470, 1473 (S.D.N.Y.1984).[11]

■ Here, the November/December correspondence between American Can and the SEC has none of the indicia of a contract. The Kanner letters cannot be construed as an offer since nothing was offered or promised. Nor were the SEC's letters a contractual offer since the SEC never proposed to give anything in return for the exemptions or "no-action" position. In short, there was no bargained-for exchange between American Can and the SEC. It is true that the SEC granted American Can's requests subject to certain conditions. However, nothing in the SEC's letters bound American Can to complete any of the proposed transactions or even to consummate the merger. In sum, the correspondence at issue is no more than a series of requests which were conditionally granted. The letters did not create a binding agreement from which third party benefits inured to the plaintiffs.

■ That shareholders of a corporation which seeks an SEC "no-action" letter are not entitled to enforce the terms of the letter is consistent with the overall regulatory scheme. To hold otherwise would lead to the anomolous result of allowing shareholders to enforce an SEC position as to a particular statute or regulation whether or not Congress intended to allow a private right pursuant to the underlying statute or rule itself. Moreover, as a practical matter the custom of soliciting the SEC's guidance in the form of exemptions or "no-action" positions with respect to transactions which fall into gray areas of the securities statutes or regulations provides indispensable

---

**11.** Moreover, it is well established that "[t]he prerequisites of a legally binding agreement arise when one party, the offeror, makes an offer and the party to whom the offer is made, the offeree, accepts;" that "[a] unilateral contract consists of an offer or promise to do something in exchange for an act in accordance with

the offer;" that "[a] contract, to be enforceable, must be supported by valid consideration;" and that "[i]n unilateral contracts the consideration is the performance of the specified act or acts." *Ingrassia v. Shell Oil Co.,* 394 F.Supp. 875, 882 (S.D.N.Y.1975) (citations omitted).

information to those seeking to structure advantageous, and sometimes creative, deals while staying within the bounds of the law. Allowing shareholders to enforce any or all of the statements contained in such exemption or "no-action" letters could only serve to deter such solicitations. Not only would this create unnecessary uncertainty in the marketplace, but it is difficult to imagine what benefit shareholders ultimately would gain if this prudent business practice was discouraged.

### B.

■ Nor is the Memorandum of Intent a contract to merge, pursuant to which plaintiffs have third party rights. It is clear from the Memorandum of Intent that the parties did not intend it to be a binding contract to merge. Paragraphs Three and Fifteen state in relevant portion:

3. *Definitive Agreement.* The Purchaser and the Company will proceed promptly to negotiate a definitive Agreement and Plan of Merger (the "Agreement") which will contain the terms and conditions for consummating the Merger. The Agreement will contain, among other provisions, representations, warranties and covenants mutually satisfactory to the Purchaser and the Company and customary conditions to the obligations of each party to effect the Merger....

\* \* \* \* \* \*

15. *Termination.* In the event the parties do not enter into the Agreement by the later of December 31, 1981 or 10 days following receipt by the Purchaser of the audited financial statements provided for in Section 8, this Memorandum of Intent shall terminate and thereafter neither party shall have any liability or obligation hereunder to the other, except that the Purchaser will reimburse the Company for 50% of the auditing expenses reasonably incurred by the Company as a direct result of this Memorandum of Intent and each party will otherwise bear expenses in accordance with the requirements of Section 14 and, for one year following the date hereof, will

comply with the requirements of Section 6 [regarding the confidentiality of information furnished to each of them by the other].

Rosenfeld Aff., Exh. 4 at 4, 10.

As we stated in *Dunhill Securities Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195, 198 (S.D.N.Y.1969) (*"Dunhill Securities "*):

A letter of intent is a customary device used within the financial community, and it is clear that the financial community does not regard such a document as a binding agreement, but rather, an expression of tentative intentions of the parties.

*See generally* McCARTHY, ACQUISITIONS AND MERGERS 130 (1963).

Under New York law contract issues are resolved by using an objective test which looks to the non-subjective intent of the parties as expressed during their dealings by their words and deeds. It is true that parties' contractual intent is frequently a matter that cannot be disposed of by summary judgment without a trial. However, in this case it is unnecessary to attempt to ascertain the intent of the parties from evidence which is external to the Memorandum of Intent since the document's language is unambiguous. *See Dunhill Securities, supra.* Moreover, having apparently abandoned this claim, plaintiffs have submitted no evidence which casts any doubt as to the meaning of the clear language contained in the October 27th document. Accordingly, plaintiffs' motion for summary judgment as to the third party beneficiary claim is denied and defendants' cross-motion is granted.

### II. *Exchange Act—Section 14(a)*

Plaintiffs assert that in violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.-14a–9, the February 25, 1982 proxy statement that was sent to Associated's shareholders to obtain their approval of the merger omitted material facts which rendered the proxy statement false and misleading.

### A.

Paragraph 16 of the Amended Complaint alleges that the proxy statement omitted the material facts (1) that "American Can had made a binding commitment to the SEC that all Associated shareholders would receive $15 (in cash or stock) in the merger;" (2) that "American Can had agreed ... that '[t]he institutions will not receive a price higher than the other shareholders of Associated will receive in the merger';" (3) that "American had assured the SEC ... that Associated shareholders would receive [between .4110 and .5085 of an American Can common stock share for each Associated common share];" (4) that "pursuant to the Memorandum of Intent, Associated's shareholders were entitled to receive, for each Associated share, either $15 in cash or American Can stock worth $15;" and (5) that "the Memorandum of Intent was amended (to promise that each Associated share would receive .4545 shares of American Can without consideration, in violation of American Can's representations to the SEC, and in order to reduce the number of shares that would be paid to Associated's shareholders)." Amended Complaint, ¶ 16(a)(1–3).

In addition, the Amended Complaint asserts:

(e) [t]he proxy statement gives the clear but materially false impression that all Associated shareholders will receive $15 in value for their Associated common stock whether in cash or in American Can common stock[;]

(f) [t]he proxy statement gives the clear but materially false impression that Associated shareholders had a bona fide choice between receiving cash or American Can stock in the merger....

Amended Complaint, ¶ 16(a)(3)(e)–(f).

\* \* \* \* \* \*

The 1982 Proxy material of February 25, 1982 was introduced by a covering letter from Gerald Tsai, Associated's Chairman of the Board. The letter announced that a special shareholders' meeting would be held on March 26, 1982, for the purpose of voting on the proposed merger of Associated into AC Financial Services Inc., American Can's wholly-owned subsidiary. The second paragraph of the covering letter stated:

[u]nder the terms of the proposed merger Associated shareholders (other than AC Financial) will be entitled to receive 0.4545 of a share of American Common Stock for each share of Associated Common Stock held, and 1.163 shares of American Common Stock for each share of Associated Preferred Stock held. In addition, *as described in the Proxy Statement—Prospectus, the holders of a limited number of shares will have the right to receive cash instead of American Common Stock* for Associated Shares.

Rosenfeld Aff., Exh. 1 (emphasis supplied).

The proxy statement itself repeatedly sets forth the terms of the merger vis-a-vis the conversion of shares. For example, the summary of the information in the proxy statement explained that

[u]pon consummation of the Merger, each outstanding share of Associated Common Stock ... will be converted into the right to receive $15.00 in cash or into 0.4545 of a share of American Common stock, par value $12.50 per share ... and each outstanding share of Associated Preferred Stock ... will be converted into the right to receive $37.50 in cash or into 1.1363 shares of American Common Stock, in each case subject to the limitations and allocation provisions in the Agreement. *Such limitations provide, in effect, that the holders of not more than about 15% of Associated's outstanding shares ... will be entitled to receive cash for their shares.* Such percentage could be further reduced, depending on the number of Dissenting Shares and the value of all Associated Capital Stock outstanding immediately prior to consummation of the Merger. *Assuming no Dissenting Shares and no change from the February 23, 1982 market value of Associated Common Stock, such percentage would be reduced to approximately 8%.*

*Id.* at ii (emphasis supplied); *see also id.* at 1, 6, 12.

The proxy statement also contained certain background facts leading to the merger, including, *inter alia,* information about American's purchase of Associated shares from five institutional shareholders. In this regard the proxy statement read:

[i]n January 1982, AC Financial purchased an aggregate of 1,754,320 shares of Associated Common Stock and 490,000 shares of Associated Preferred Stock from five institutional holders of such shares. Such purchases were at $13.00 per share of Associated Common Stock and $32.50 per share of Associated Preferred Stock. Upon consummation of the Merger, such institutional holders of Associated Common Stock will be paid an additional $2.00 and such institutional holders of Associated Preferred Stock will be paid an additional $5.00 per share so that the ultimate cash price per share sold in such transactions will be the same as the cash price per share payable pursuant to the Agreement to those Associated shareholders whose shares are converted into the right to receive cash.

*Id.* at 4.

Finally, the proxy statement quoted American Can and Associated stock prices during various time intervals. It stated, for instance, that

[o]n February 23, 1982, [the day the merger agreement was signed], the last sale prices per share reported on the NYSE Composite Tape for American Common Stock and Associated Common Stock were $27⅝ and $12⅜, respectively. *Shareholders are urged to obtain current market quotations.*

*Id.* at 17 (emphasis in the original).

 \* \* \* \* \* \*

Aside from a conclusory statement that the alleged omissions were "so obviously important to the investor" that summary judgment should be granted for the plaintiff, the sole explanation that plaintiffs offer as to why the omissions are material is that, had the information been included, "shareholders would have insisted, of course, that they be paid the same value paid to the institutions, i.e., $15 per share." Plaintiffs' Memorandum at 16.

The defendants' response admits the omissions from the proxy statement. Their defense is that the only "condition" underlying the SEC exemptions was one that placed restrictions on the time periods during which American Can could purchase its own stock and that, in any event, they were not required to include in the proxy statement information concerning the exemption; that the asserted omissions were not "material;" and that the omitted information did not make the proxy statement "materially false or misleading."

Rule 14a–9 states in relevant portion that no solicitation ... shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

17 C.F.R. § 240.14a–9(a).

 Under the rule, an omitted fact is material if it

would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Moreover, as stated in the rule and confirmed in the caselaw, omissions violate Rule 14a–9 only when they are material *and* they make statements that are contained in the proxy statement false or misleading. *See Freedman v. Barrow,* 427 F.Supp. 1129, 1139 (S.D.N. Y.1976).

 The defendants interpret the SEC's correspondence too narrowly. It is true that the Commission used the word "condi-

tion" only in reference to the time constraints imposed upon American Can's proposed stock purchases. However, both of the December letters stated that

> [t]he foregoing exemption from Rule 10b–6 and the no-action position taken under Rule 10b–13 are based solely on your representations and the facts you have presented to the staff.... *Such purchases should be discontinued pending presentation of the facts for our consideration, in the event that any material change occurs with respect to any of those facts or representations.*

*See, e.g.,* Rosenfeld Aff., Exh. 8 at 3 (emphasis supplied). A fair reading of this statement is that the exemptions and no-action positions were granted *on the condition* that if the transactions were conducted, they were conducted in accordance with the facts as represented. Accordingly, defendants' assertion that the SEC imposed only one condition is rejected. Nevertheless, for reasons explained below, we conclude that the omissions are not material as a matter of law.

■ The fallacy of plaintiffs' theory of materiality is that it assumes that the plaintiffs had the right to demand receipt of the equivalent of $15 per share. However, for reasons set forth in Point I, *supra,* we have held that neither the SEC correspondence nor the Memorandum of Intent were binding agreements whose terms plaintiffs were entitled to enforce. Indeed, as of March 26, 1982, the date on which the shareholder meeting was held, the plaintiffs had no contractual rights in the merger transaction. *See Rediker v. Geon Industries, Inc.,* 464 F.Supp. 73, 79–80 (S.D.N.Y.1978) (holding that shareholders have no contractual rights until after a merger is consummated). Instead, the shareholders merely had the option of accepting or rejecting the terms of the agreement as offered. Accordingly, the "facts" and statements that were allegedly omitted from the proxy statement would not only have been inaccurate, if included, but would also have constituted incorrect legal propositions. In sum, the "omissions" are immaterial.

Nor does the omitted material render the remaining contents of the proxy statement false or misleading. Upon completion of the merger transaction, approximately 8% of the Associated shareholders received $15 cash per common stock share, the institutional shareholders received $2 per common stock share in addition to the $13 per share that they received under the earlier purchase agreements, and the remaining shareholders received American Can stock valued at $12.61 per share. Comparing these facts with the content of the proxy statement, it is readily apparent that the stock (or cash) exchange that occurred after the merger was consistent with the proxy statement's description of the merger and its consequences in all material respects. Moreover, although information relating to the tentatively agreed upon, but later amended terms was not contained in the proxy statement, the omission of that information did not make false any of the material contained in the proxy statement which accurately described the only proposal then "on the table" for shareholder approval or disapproval. To the contrary, in all likelihood the proxy statement could well have been misleading if it had contained information concerning the earlier terms. Any such material would have had to include an explanation of the complicated flexible exchange ratio formula, only to then explain that the formula had been abandoned in favor of the fixed ratio exchange rate.

■ Further, plaintiffs point to no evidence to support the claim that the proxy statement gave the misleading impression that Associated shareholders had a *bona fide* choice between receiving cash or stock, and that, in any event, all shareholders would receive $15 in value for their Associated common stock. The proxy statement repeatedly explained that depending on other factors, it was likely that between 8% and 15% only of the shareholders ultimately would receive cash in the merger. It further set forth, in several places, the exchange formula and specifically urged

shareholders to consult market prices to determine what they would net in the merger. Although the actual computations using the .4545 exchange ratio were not performed, the law does not require such tabulations to be carried out in the proxy statement when an exact calculation is not possible at the time the proxy statement is mailed and the proxy statement explains how such calculations should be made. *See Mesh v. Bennett,* 481 F.Supp. 904 (S.D.N.Y. 1979).

For the foregoing reasons, plaintiffs' motion for summary judgment on the issue of liability under Section 14(a) of the Exchange Act is denied. Summary judgment is granted for the defendants except, for reasons stated below, as to the claim alleged in paragraph 16(a)(3)(d) of the Amended Complaint.

### B.

Paragraph 16(a)(3)(d) alleges that

[t]he proxy statement omits to state the material fact that the Amendment was made when it was known that American Can's earnings for the fourth quarter of 1981 would be sharply reduced and that previously reported earnings for 1981 would be restated and reduced; and that, therefore, American Can's stock would decline, and Associated shareholders would receive substantially less than $15 worth of American Can stock in the merger.

Plaintiffs assert that during the fourth quarter of 1981 American Can agreed with its auditors, Coopers and Lybrand, to engage in a "business restructure" to "dispose of certain marginal operations." *See* Rosenfeld Affidavit, Exhs. B, C, D (May 17, 1985).[12] The effect of the restructuring was that American Can's "[n]et income for the fourth quarter and full year 1981 was reduced by $15.1 million ($.78 per share)." Holmes Aff., Exh. G. Plaintiffs assert, and the evidence suggests, that the defendants were aware as early as October 26, 1981 that American Can would be reporting reduced earnings for the quarter ending December 31, 1981. *See* II. Rosenfeld Aff., Exh. B. Upon this evidence they argue that the defendants knew at the time the exchange formula was amended to reflect a fixed ratio that there would be a corresponding American Can stock price decline. Such information, the plaintiffs assert, constitutes a material omission from the proxy statement. They further argue that, in any event, summary judgment cannot be granted because there is a genuine issue of fact as to the defendants' knowledge.

In response, defendants submit a portion of the deposition testimony of Kenneth Yarnell, American Can's senior financial officer. Holmes Aff., Exh. B; *see also* II Rosenfeld Aff., Exh. J. Yarnell testified that American Can had an outstanding tender offer for its own shares between January 12 and February 2, 1982, and that he had been advised by American Can's investment bankers, Salomon Brothers and Lazard Freres, that American Can stock could be expected to remain at the tender offer price (*i.e.*, $33.50 per common stock share) or increase, during the pendency of the tender offer.

Defendants argue that plaintiffs have not submitted any evidence which supports plaintiffs' assertion that there was reason to believe that the one-time, nonrecurring charge against earnings for the fourth quarter of 1981 would cause a decline in American Can's stock price. They maintain that plaintiffs have failed to submit evidence to contradict Yarnell's testimony. The defendants contend that plaintiffs' failure to produce any facts to support their charge compels the grant of American Can's cross-motion for summary judgment.

We note, first, that the nature of plaintiffs' claim is not completely clear. If plaintiffs are alleging that the "material fact" that was omitted was the defendants' alleged knowledge on January 12, 1982 (the date the terms of the merger were amended) that the newly fixed ratio would give the Associated shareholders less than the $15 per share they would have received under the original terms in the Memorandum of Intent, then the claim fails. As

---

**12.** Hereafter "II. Rosenfeld Aff., Exh. ____."

stated above, plaintiffs never acquired vested rights in the Memorandum of Intent. On the other hand, if plaintiffs' intention is to assert that American Can's business restructure had a material adverse effect (for a significant time period) on the price of the company's stock, of which the defendants were aware or should have been, the omission of such information would probably constitute an actionable material omission.

As to the evidence thus far produced, it is logical that an outstanding tender offer will tend to set the prevailing market price at the tender offer price during the pendency of the offer. Moreover, there is no evidence which disputes either the soundness of the investment banks' opinions, or the fact that Yarnell relied upon their advice. Accordingly, the record does not raise an issue as to whether American Can knew that its stock price would decline between January 12 and February 2. However, Yarnell's testimony does not address whether, notwithstanding a temporary price "freeze" due to the tender offer, the defendants knew that the business restructure would cause a decline in the value of stock that would continue through, and have an impact on, what the Associated shareholders would receive for their stock if the merger was consummated. In this regard, although the evidence relied upon by American is inconclusive, neither have plaintiffs submitted any evidence to suggest that the fourth-quarter charge against

earnings would result in a continuing decline in stock value *and that American* knew of this likelihood. Accordingly, plaintiffs' motion for summary judgment is denied. Further, summary judgment will be granted for the defendants unless within two weeks of the filing of this Memorandum, plaintiffs submit competent evidence as to this issue, or, in the alternative, plaintiffs submit a detailed affidavit pursuant to Federal Rule of Civil Procedure 56(f) explaining why they are unable to present by affidavit facts essential to justify opposition to defendants' cross-motion.

III. *Exchange Act Section 10(b)*

■ Upon the same allegedly material omissions asserted in paragraph 16 of the Amended Complaint, *see* Point II, *supra*, plaintiffs allege violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),[13] and Rule 10b–5, 17 C.F.R. § 240.10b–5.[14] Since the standard of materiality under Section 10(b) is identical to that under Section 14(a), *see, e.g., Goldberg v. Meridor*, 567 F.2d 209, 218–19 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), for the reasons set forth in Point II, *supra*, summary judgment is granted for the defendants as to paragraph 17 in the Amended Complaint except insofar as plaintiffs' claim under Section 10(b) and Rule 10b–5 relies on the alleged omission contained in paragraph 16(a)(3)(d) of the Amended Complaint. *See Lewis v. Valley*, 476 F.Supp. 62, 66–67 (S.D.N.Y.1979).

**13.** 15 U.S.C. § 78j provides:
MANIPULATIVE AND DECEPTIVE DEVICES
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
\* \* \* \* \* \*
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**14.** Rule 10b–5 states:

§ 240.10b–5 Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.
(a) To employ any device, scheme, or artifice to defraud.
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

## IV. *Williams Act Sections 14(d) and 14(e)*

Plaintiffs assert that both (1) the cash-election merger and (2) American's offer to purchase and the purchase of Associated stock from several institutional shareholders constituted tender offers. As a result they claim in paragraph 18 of the Amended Complaint that under Sections 14(d)(7) and 14(e), 15 U.S.C. §§ 78n(d)(7) and 78n(e), the defendants were obligated to give all shareholders the same price for their Associated stock as the institutional shareholders received, that is, $15 per common stock share. Plaintiffs have not moved for summary judgment on this claim, but the defendants have, claiming that they are entitled to summary judgment because neither the cash-election merger nor the pre-merger stock purchases constituted a tender offer.[15]

 Sections 14(d) and 14(e) of the Williams Act, regulate tender offers. Section 14(e), 15 U.S.C. § 78n(e),[16] proscribes fraud in broad terms, while Section 14(d), 15 U.S.C. § 78n(d), contains both a mandatory disclosure requirement and substantive restrictions. Section 14(d)(7), 15 U.S.C. § 78n(d)(7), requires that whenever the purchase price in a tender offer is increased, the increased price must be paid to all tendering shareholders, including those who earlier tendered shares in response to a lower offer.[17] The intent of this subsection is to ensure that all tendering shareholders are treated equally. Like Section 14(e) and the remainder of Section 14(d), Section 14(d)(7) only is triggered by the making of a tender offer.

The issue raised by the defendants' motion is familiar. Although the Williams Act nowhere defines a tender offer, it is apparent from the legislative history that Sections 14(d) and 14(e) apply to what is often referred to as a "classic" or "conventional" tender offer.[18] However, almost from the date of the statute's enactment, courts (as well as the SEC and commentators) have concluded that application of Sections 14(d) and 14(e) is not limited to "classic" tender offers [19] and have proceeded to construct various approaches for defining the statutory term. One of the most widely favored approaches was an eight-factor test recommended by the SEC. *See, e.g., Wellman v. Dickinson,* 475 F.Supp. 783, 823–24 (S.D.N.Y.1979), *aff'd on other grounds,* 682 F.2d

---

**15.** The defendants also argue that the Memorandum of Intent was not a tender offer. The Amended Complaint, as we read it, does not make such a claim. Nor do the plaintiffs argue such an assertion in their briefs.

**16.** Williams Act Section 14(e), 15 U.S.C. § 78n(e), states in relevant portion:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

**17.** Williams Act Section 14(d)(7), 15 U.S.C. § 78n(d)(7), states:

Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

**18.** As described in the congressional debates, a classic tender offer

normally consists of a bid by an individual or group to buy shares of a company-usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

*See* S.Rep. No. 550, 90th Cong., 1st Sess. 2 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 2 (1968), U.S.Code Cong. & Admin.News, 1968, p. 2811.

**19.** *See generally* Note, *The Developing Meaning of "Tender Offer" under the Securities Exchange Act of 1934,* 86 HARV.L.REV. 1250, 1260–70 (1973).

355 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).[20] The test was aimed at distinguishing "public offerings" (which have been held to invoke the Williams Act) from "private negotiations" (which generally have been considered exempt from the Act's protections).

The Court of Appeals for the Second Circuit has very recently concluded that rigid adherence to the eight-factor test is not the better method of determining whether a particular solicitation constitutes a tender offer. *Hanson Trust PLC v. SCM Corporation,* 774 F.2d 47 (2d Cir. 1985). While acknowledging the continued relevance of many of the eight factors, the *Hanson* court concluded that "the elevation of such a list to a mandatory 'litmus test' [is] both unwise and unnecessary." *Id.* at 57. Preferring, instead, to be guided by Congress' purpose in enacting the Williams Act (*i.e.,* to alleviate the pressure on shareholders to make hasty, ill-informed decisions due to the pressure-creating characteristics of traditional tender offers), the Court of Appeals held that the proper focus of the inquiry is

> whether, viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.

*Id.* at 57.

## A.

■ Our research has uncovered no decisions which consider whether the cash option feature of a merger constitutes a tender offer under the Williams Act. Indeed, the only authority on the issue appears to be an SEC interpretative release in which the Commission concluded that

> [w]hile the matter is not free from doubt, when a statutory merger contains a cash option feature [like the one in the instant action] the Division will not take the position that a tender offer is involved and will not suggest that a Williams Act filing on Schedule 14D–1 be made. This position is predicated, in part, on the Division's view that the shareholder's election to receive cash or securities of the acquiring company as consideration for the shares to be surrendered is part of the shareholder's investment decision whether to vote for or against the merger proposal, since the election occurs during the same time period that the shareholder votes on the merger proposal.

Exchange Act Rel. No. 14699, 3 Fed.Sec.L. Rep. (CCH) ¶ 24,284H at 17,756 (Apr. 24, 1978). As the agency charged with primary responsibility for implementing the federal securities regulation, the Commission's "interpretation of a federal [securities] statute is entitled to substantial deference," *Securities Industry Association v. Board of Governors,* 468 U.S. 137, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984), provided that the agency's statutory construction is not "inconsistent with the statutory mandate or [does not] frustrate the policy that Congress sought to implement." *Id.*

■ The SEC's conclusion that the cash option portion of a cash election merger is

---

**20.** The eight factors are:
"(1) active and widespread solicitation of public shareholders for the shares of an issuer;
(2) solicitation made for a substantial percentage of the issuer's stock;
(3) offer to purchase made at a premium over the prevailing market price;
(4) terms of the offer are firm rather than negotiable;
(5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased;

(6) offer open only a limited period of time;
(7) offeree subjected to pressure to sell his stock; ...
[(8)] public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities."
475 F.Supp. at 823–24.

not a tender offer is consistent with the statutory scheme, which, in its current embodiment, regulates mergers and tender offers under two separate sets of rules, the proxy rules and the tender offer rules.[21] *Compare* Williams Act § 14(a), 15 U.S.C. § 78n(a) *and* 17 C.F.R. § 240.14a–9 (proxy rules) *with* Williams Act § 14(d)–(e), 15 ·U.S.C. § 78n(d)–(e) (tender offer rules).

██ Moreover, in this case the cash election merger is not the type of transaction which tends to force shareholders into a hasty, uninformed decision brought about by a combination of pressure-exerting influences. The proxy statement received by the Associated shareholders contained detailed information about the proposed merger and certainly provided the information necessary to make an intelligent choice between electing cash or stock in the exchange.[22] Further, the shareholders had four weeks to make their decision and sixty days after the preference deadline to change their minds. *See* Rosenfeld Aff., Exh. 10 at 7–8 (proxy statement "Election Procedure"). It is true that only a limited number of shareholders would receive cash in the merger transaction. However, the determination of which shareholders would receive cash, in the event that more than the maximum allowable number of shareholders expressed such a preference, was to be made by a random-selection process and did not depend on who responded to the proxy material first. In sum, precisely because mergers are covered by the proxy rules, there is no "substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them." *Hanson*

*Trust Co. v. SCM Corporation, supra,* at 57.

**B.**

After receipt of the 10b–6 exemptions from the SEC, American Can entered into negotiations with six institutional shareholders to purchase Associated stock. Five of the six negotiations came to fruition. Between December 24, 1981 and January 4, 1982 American signed stock purchase agreements with five institutions, whose names appear in the margin.[23]

Under the stock purchase agreements American paid the institutions $13 per Associated common share and $32.50 per Associated preferred share. In addition, it was agreed that if the merger was consummated and any other shareholder received more than $13 in cash per common share, the institutions would be paid cash equal to the difference between $13 and the price received by other shareholders. As previously stated, American's purchase of 1,754,320 shares of Associated common stock and 490,000 shares of Associated preferred stock pursuant to the agreements was announced in two separate January 1982 press releases.

██ Relying on the eight-factor test, defendants argue that the offer to purchase and the stock purchases from the institutional shareholders are not tender offers because (1) they were private transactions involving "prolonged negotiations" with highly sophisticated investors; (2) the offers to purchase stock were not contingent upon American Can's acquisition of a certain minimum number of shares and

---

21. Largely due to recent trends in negotiated acquisition practice, which, it is asserted, have blurred the lines between mergers and tender offers, many commentators have criticized the current, dichotomous statutory framework as producing anomolous results. *See, e.g.,* Freund and Greene, *Substance Over Form, supra* note 2; Greene and Junewicz, *A Reappraisal of Current Regulation of Mergers and Acquisitions,* 132 U.PA.L.REV. 647, 696 (1984) [hereafter "Current Regulation"].

22. Indeed, proxy statements such as the one here at issue have been criticized for providing

too much information. *See, e.g., Current Regulation, supra* note 21, at 696; *Substance Over Form, supra* note 2 at 1524.

23. They are: American General Life Insurance Company of New York; Life and Casualty Insurance Company of Tennessee; Lincoln National Corporation; First Venture Capital Corporation of Boston; and Term Capital Management Corporation. Morgan Guaranty Trust Company negotiated with American Can but the companies were unable to reach mutually agreeable terms.

were not conditioned upon acceptance by a fixed date; (3) only six out of over 2,000 shareholders, *i.e.*, .003 percent, were solicited; (4) the shares were not bought at a premium; and (5) there is no evidence that the institutions were subjected to any pressure to make an ill-considered decision.

The record supports the defendants' arguments. One of American's senior financial officers testified on deposition that each of the purchase agreements was the result of negotiations, and that American Can did not enter the discussions with a fixed "take it or leave it" price in mind. *See* Holmes Aff., Exh. B. (Yarnell Deposition). In addition, Patricia Peters, an employee of Morgan Guaranty Trust Company, testified that the negotiations between Morgan Guaranty and American Can continued for several weeks before Morgan Guaranty decided not to enter into a stock purchase agreement with American Can. *See* Holmes Aff., Exh. I.

■ Further, although there is no direct evidence as to the level of business acumen possessed by the institutions from whom American purchased stock, excerpts of the agreement entered into with Lincoln National Corporation reveal a carefully drafted document tending to indicate that it was the result of negotiations conducted by parties at Lincoln National who were experienced in such transactions and who were more than capable of protecting that corporation's interests. Moreover, in the absence of evidence to the contrary, it must be presumed that, as a general proposition, businesses of the type involved here, and in particular, companies in which the stock involved is held in a pension fund for some 225 employees who are the beneficial owners (as was true of at least Morgan Guaranty), have expertise in securities matters.

■ In sum, nothing in the record suggests that there was a substantial risk that the selling parties were pressured into making hurried, unintelligent decisions. Indeed, absent unusual circumstances, it is questionable whether privately negotiated, "arms-length" transactions with large corporations or business entities, such as the ones involved here, will ever present the type of situation which requires the Williams Act tender offer protections. As one commentator has noted,

> [i]n negotiated purchases from a few, substantial shareholders, pressure is . . . absent since these shareholders have the leverage to obtain the disclosure, time, and fair treatment necessary to make an informed, carefully considered decision on whether to sell their controlling interest.

Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 HARV.L.REV. 1250, 1276 n. 137 (1973).

It is true that the record in this case is not as fully developed as, for example, in *Hanson*, where the defendant appealed from a preliminary injunction issued after a hearing. However, plaintiffs have submitted no evidence which casts doubt on the defendants' assertions or otherwise raises a genuine issue as to whether the stock purchases from the institutional shareholders constituted tender offers. The plaintiffs' reply to the defendants' cross-motion for summary judgment on this issue is a conclusory assertion that "the record needs many more facts before the question of the applicability of the Williams Act can be decided." Plaintiffs' Reply Memorandum at 37. Accordingly, summary judgment will be granted unless within two weeks of the filing of this Memorandum Decision plaintiffs submit a detailed affidavit pursuant to Federal Rule of Civil Procedure 56(f) stating what relevant evidence plaintiffs believe in good faith would be revealed by further discovery.

### V. *Plaintiffs' State Claim*

■ Plaintiffs assert that the merger between Associated and American Can violated Section 501(c) of New York's Business Corporation Law, N.Y.BUS.LAW § 501(c). Plaintiffs and defendants both argue that they are entitled to summary judgment on this claim. However, since jurisdiction over this claim is on a pendent basis and requires a valid federal claim to

which to attach, *see Lewis v. Valley,* 476 F.Supp. at 67, decision on the cross-motions is deferred until summary judgment on the remaining federal claims is either granted or denied.

## CONCLUSION

Plaintiffs' motion for summary judgment as to their federal claims is denied. Defendants' motion for summary judgment as to plaintiffs' third party beneficiary claims is granted and paragraph 20 of the Amended Complaint is dismissed. Decision as to plaintiffs' state law claim is reserved. Defendants' cross-motion for summary judgment on plaintiffs' claims under Exchange Act Sections 10(b) and 14(a) is granted as to all of the alleged omissions except for the one contained in paragraph 16(a)(3)(d) of the Amended Complaint. As to that paragraph, defendants' cross-motion will be granted unless plaintiffs submit appropriate affidavits within two weeks. Defendants' cross-motion for summary judgment on Williams Act Section 14(d)(7) is granted as to the cash election merger; as to the institutional stock purchases, defendants' cross-motion will be granted unless within two weeks from the filing of this Memorandum plaintiffs submit affidavits pursuant to Rule 56(f), Fed.R.Civ.P., in accordance with the decision above. If plaintiffs fail to submit such affidavits, defendants may submit a judgment on notice.[24]

It is so ordered.

---

**24.** The individual defendants argue that if summary judgment is not granted for the reasons set forth in the defendants' Joint Memorandum of Law, summary judgment still should be granted in favor of the individual defendants as to plaintiffs' claims under Exchange Act Sections 14(a) and 10(b) because there is no evidence to support the claims. To the extent summary judgment is granted, it is granted as to all defendants. As to the open claims, consideration of the individual defendants' arguments is deferred until plaintiffs have had the opportunity to submit further evidence or an affidavit under Fed.R.Civ.P. 56(f) in accordance with the decision above.